[No. A126357. First Dist., Div. One. Oct. 26, 2011.]

CITY OF SCOTTS VALLEY, Plaintiff and Respondent, v.
COUNTY OF SANTA CRUZ et al., Defendants and Appellants.

4

6

COUNSEL

Rutan & Tucker and William M. Marticorena for Defendants and Appellants.

Thomas M. Tyrrell, Principal Deputy County Counsel, and Elizabeth M. Cortez, Assistant County Counsel, for California State Association of Counties as Amicus Curiae on behalf of Defendants and Appellants.

Logan & Powell, Kirsten Powell, Robert C. Chojnacki; Jarvis, Fay, Doporto & Gibson, Benjamin P. Fay and Rick W. Jarvis for Plaintiff and Respondent.

Colantuono & Levin, Michael G. Colantuono and Holly O. Whatley for League of California Cities as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

BANKE, J.—

## I. INTRODUCTION

"There is no equitable way to share property tax revenues, only different degrees of inequity." (Sen. Com. on Local Government, Rep. on Sen. Bill No. 407 (1987–1988 Reg. Sess.) Apr. 20, 1987, p. 2.) This observation is as true today as when it was made during the legislative process more than 20 years ago.

In this case, the City of Scotts Valley (City) claims it has not received all the property tax revenues to which it is entitled. Specifically, the City claims the Auditor-Controller of the County of Santa Cruz (Auditor-Controller) has not properly applied Revenue and Taxation Code section 98, which entitles "no- and low-property tax cities" to a certain percentage of the property taxes paid by their residents. The trial court agreed with the City and granted its petition for a writ of mandate against the County of Santa Cruz and the Auditor-Controller (collectively the County). The court ordered the County to change its allocation methodology and reallocate approximately $2 million in property tax revenues to the City for past fiscal years. The County has appealed, but the trial court's order did not finally dispose of all claims in the case. Accordingly, the parties urge us to deem the County's appeal an original writ proceeding. Given the nature and importance of the property tax allocation issues presented by this case, we conclude it is appropriate to do so. We also conclude the trial court was correct, in part, and incorrect, in part, and therefore grant limited writ relief to the County.

## II. BACKGROUND

### A. Overview of Relevant Statutes

The factual and procedural background of this case can only be understood with some knowledge of the real property tax system that has given rise to the allocation issues in this case. This system has its roots in the voter's enactment of Proposition 13 in 1978 imposing a 1 percent cap on real property tax rates, their enactment of Proposition 98 in 1988 imposing a state funding mandate for public education, and negative economic conditions that have since periodically pummeled the state's economy. To say this system is dense, prolix and arcane is an understatement.

#### 1. Basic Property Tax Allocation

The passage of Proposition 13 (Cal. Const., art. XIII A) fundamentally altered the state's property tax system. Whereas local governmental entities

had previously imposed their own property tax rates, Proposition 13 set the tax rate for all real property statewide at 1 percent of assessed value. The proposition directed counties to collect the property tax and allocate it among local governmental entities as determined by the Legislature. (Cal. Const., art. XIII A, § 1, subd. (a).)

The Legislature immediately enacted "bailout" legislation to provide state funding to replace local property tax revenues lost as a result of Proposition 13. (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Sen. Bill No. 1361 (1993–1994 Reg. Sess.) July 20, 1994, p. 1 (hereafter Governor's Enrolled Bill Report on Senate Bill 1361); Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 617 (1991–1992 Reg. Sess.) as amended Aug. 22, 1992, p. 7.) It also enacted a temporary allocation system for the next fiscal year (fiscal year 1978–1979). (Stats. 1978, ch. 292, § 24, p. 606.) County auditors were generally directed to allocate property tax revenues among local governmental entities in proportion to their tax rates in the preceding fiscal year (i.e., the year prior to the passage of Prop. 13). (Gov. Code, § 26912, subd. (b).)

The following year, the Legislature enacted what is called the "A.B. 8" allocation system (after the applicable Assem. Bill), now codified as Revenue and Taxation Code sections 96 and 96.5 (originally enacted as § 98 [Stats. 1979, ch. 282, § 59, pp. 1028–1029]).[1] "Under AB 8, each fiscal year a local government receives property tax revenues equal to what it received in the prior year (base), plus its share of any increase in revenues due to growth in assessed value within its boundaries. Each year, this increment growth is added to the previous year's base, and together becomes next year's base amount." (Governor's Enrolled Bill Report on Sen. Bill 1361, p. 1.) Assembly Bill No. 8 (1978–1979 Reg. Sess.) (Assem. Bill 8) "did not eliminate the 'bailout' support. 'Bailout' was made a permanent feature of the state-local fiscal relationship by means of the permanent shift of the school property tax base to local agencies and state 'buyout' of certain county health and welfare program costs." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 617 (1991–1992 Reg. Sess.) as amended Aug. 22, 1992, p. 7.)

Specifically, section 96 directed county auditors to determine the "tax base" for each local taxing entity for the 1979–1980 fiscal year. This was determined by allocating to each entity within a tax rate area,[2] the same amount of property taxes it received from that tax rate area in the previous

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

[2] A "tax rate area" is a geographic area in which all of the property is within the jurisdiction of the same combination of local taxing entities that share in the property taxes collected in

fiscal year. (§ 96, subd. (a).) Then, under section 96.5, the "tax increment"— the increased (or decreased) tax revenues received in the current tax year— was allocated to the local entities in proportion to their "base." (§§ 96, subd. (c), 96.5.) Accordingly, local governmental entities that had higher pre-Proposition 13 tax rates relative to other entities, continued to receive a higher proportion of the property tax revenues generated pursuant to the 1 percent tax rate.

Since the 1980–1981 fiscal year, the A.B. 8 allocation system has been implemented through sections 96.1 (originally enacted as § 97 [Stats. 1979, ch. 282, § 59, p. 1028]), 96.2 (originally enacted as § 97.5 [Stats. 1980, ch. 801, § 9, p. 2511]) and 96.5. This statutory allocation process is similar to, and based on, the process for the 1979–1980 fiscal year. First, the tax base is determined, i.e., in each tax rate area, each local governmental entity is allocated the same amount of property tax it was allocated the preceding year. (§ 96.1, subd. (a)(1).) Second, the annual tax increment is allocated under section 96.5 in accordance with the same proportions applicable to the base. (§§ 96.1, subd. (a)(2), 96.5.) In this way, the proportional allocations established in the first fiscal year following the passage of Proposition 13, as modified for the following fiscal year, are perpetuated year after year, unless modified by the Legislature.

### 2. Tax Equity Allocation (TEA)

In 1987, nine years after the passage of Proposition 13, the Legislature addressed what had become a politically charged dispute over a perceived inequity in the A.B. 8 allocation system. Under the A.B. 8 allocation system, cities that had levied no property tax before the passage of Proposition 13 received none of the property tax being paid by their residents, even though their residents were paying the same 1 percent property tax every other property taxpayer in the state was paying. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1197 (1987–1988 Reg. Sess.) as amended Aug. 31, 1988.) Similarly, some "newly incorporated cities" (i.e., cities incorporated after Prop. 13) received a very small tax base and thus commensurately received a very small percentage of property tax revenues.[3] (Joint Conf. Com.

---

that area. (§ 95, subd. (g).) A single city can have several tax rate areas, for example, if parts of the city are included in redevelopment areas or special districts that do not encompass the entire city.

[3] Prior to 1984, 31 cities had no property tax. (Governor's Enrolled Bill Report on Sen. Bill 1361, p. 2.) In that year, the Legislature passed legislation guaranteeing one of these cities, Yorba Linda, a minimum of 10 percent of the local tax revenues. Since that allocation was still less than the allocation to other cities, Yorba Linda "was considered the first 'low property tax city.'" (*Ibid.*) By 1987, the other 30 "no tax" cities wanted the same treatment. (Sen. Com. on Local Government, Rep. on Sen. Bill No. 407 (1987–1988 Reg. Sess.) Apr. 20, 1987, p. 1.) So did 20 cities in Los Angeles County, which called themselves "low tax cities" because they

Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.) p. 26; see Stats. 1988, chs. 944 & 945, pp. 2977–3025 [Brown-Presley Trial Court Funding Act (Gov. Code, § 77000 et seq.)].) To help alleviate this disparity in the receipt of property tax revenues, the Legislature enacted TEA, now codified as section 98 (originally enacted as § 97.35 [Stats. 1987, ch. 1211, § 47.7, p. 4329]).[4]

The legislative history reflects the difficulty of the problem: "There is no equitable way to share property tax revenues, only different degrees of inequity. Officials from the no-property-tax cities point out that their constituents pay the same 1% tax rate as everyone else, but their cities receive nothing. County officials note that reallocating revenues benefits the residents of those cities at the expense of countywide health, welfare, and justice programs. . . . The allocation of property tax revenues is a 'zero-sum game,' in which there must be a loser for every winner. . . . Rather than searching for perfect equity, the Committee may need to balance the different forms of inequity."[5] (Sen. Com. on Local Government, Rep. on Sen. Bill No. 407 (1987–1988 Reg. Sess.) Apr. 20, 1987, p. 2.) Indeed, in the 1987–1988 legislative session, 10 different bills were introduced to address the tax revenue situation of no- and low-property-tax cities. (Joint Conf. Com. Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.) pp. 27–28.)

TEA is viewed as "a minimum property tax entitlement for each city incorporated before June 5, 1987." (Joint Conf. Com. Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.).) Section 98 thus specifies: "Except as otherwise provided in this section, each qualifying city *shall*, for the 1989–90 fiscal year and each fiscal year thereafter, be allocated by the auditor an amount determined pursuant to

---

received less than 10 percent of local property tax revenues. (*Ibid.*; see also Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1197 (1987–1988 Reg. Sess.) as amended Aug. 31, 1988, p. 2 ["Cities which never levied a property tax or which levied only low property tax rates are called no- and low-property-tax cities."].)

[4] Prior to the enactment of the TEA statute, the Legislature had afforded some relief to the "31 no-property-tax cities" through various transfers of Vehicle Licensing Fee (VLF) revenues. (Joint Conf. Com. Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.) p. 24.) This relief was eliminated with the passage of the TEA statute. (Joint Conf. Com. Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.) p. 24.)

[5] The counties argued, for example, post-Proposition 13 cities that had received some property tax base through the incorporation process should be excluded from TEA because the Legislature had not "froze[n] them out" of the property tax system. (Joint Conf. Com. Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.) p. 26.) These "newly incorporated cities" argued the counties controlled the formation process, the process was biased against cities and TEA was a matter of equity. (Joint Conf. Com. Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.) p. 26.)

the TEA formula." (§ 98, subd. (b)(1), italics added.) However, only a "qualifying city," now defined as a city that receives less than 7 percent of the property tax revenues generated within its tax rate areas, is entitled to TEA.[6] (§ 98, subds. (a), (c), (d).)

TEA is an alternative allocation system. "[T]he auditor in each county with qualifying cities . . . is required to make property tax revenue allocations to those cities in accordance with a specified [TEA] formula and to make corresponding reductions in the county's property tax revenue allocation." (Legis. Counsel's Dig., Assem. Bill No. 1197 (1987–1988 Reg. Sess.) 4 Stats. 1988, Summary Dig., p. 289.) Accordingly, each year there must be a comparison between what a qualifying city would receive under the TEA statute and what it would receive under the A.B. 8 statutes, since revenues will be allocated under the TEA statute only if the amount exceeds what would be allocated to the city under the A.B. 8 statutes. (§ 98, subd. (k); Off. of Local Government Affairs, Enrolled Bill Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) Sept. 9, 1988, p. 2 [receipt of TEA will "only occur if it is no less than what the qualifying cities would have received without the TEA formula"].) What a qualifying city would receive under the TEA statute is determined by the six-step "TEA formula" set forth in the statute. (§ 98, subd. (c)(1)–(6).)

When a qualifying city receives tax revenues under section 98, it is allocated the amount of tax revenues called for by the TEA formula. The A.B. 8 allocation the city would otherwise have received, but for the application of the TEA statute, is allocated to the county. (§ 98, subds. (b)(1)–(2), (j).) Thus,

---

[6] As initially enacted, the TEA statute defined "qualifying city" as a city that received less than 10 percent of local property tax revenues; or stated another way, the initial TEA "entitlement" was 10 percent of local property tax revenues. (Joint Conf. Com. Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.) p. 23.) That mandate, effective for the 1988–1989 fiscal year, required "17 counties to shift some of their own property tax revenues to 49 'qualifying cities' (SB 709, Lockyer, 1987)." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1197 (1987–1988 Reg. Sess.) as amended Aug. 31, 1988, p. 2.) The following year, the "entitlement" was reduced to 7 percent. (*Ibid.*) The Legislature also at that time partially resurrected the special subvention of VLF to some of these cities. (Legis. Counsel's Dig., Assem. Bill No. 1197 (1987–1988 Reg. Sess.) 4 Stats. 1988, Summary Dig., pp. 289–290; Off. of Local Government Affairs, Enrolled Bill Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) Sept. 9, 1988, p. 3 ["AB 1197 would restore the VLF allocation to no-property-tax cities, but would phase it out, on a dollar for dollar basis, as such cities receive the property tax allocation under this bill. However, revenues from the VLF phase-out would be distributed to specified eligible no-and-low property tax cities, under specified conditions."].)

the additional revenues allocated to qualifying cities under the TEA statute are effectively "taken" from the property tax revenues allocated to the counties.[7]

As initially enacted, the TEA statute did not address the tax revenue generated by property held by local community redevelopment agencies, generally referred to as the "redevelopment agency tax increment." (Off. of Local Government Affairs, Enrolled Bill Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) Sept. 9, 1988, p. 2 ["SB 709 [(passed the preceding year and which established TEA)] does not contain provisions for redevelopment agency tax increment financing."].) At the behest of the counties, which complained the failure to take redevelopment tax increment into account resulted in an unfair loss of their tax revenues, the Legislature expanded the TEA formula the following year to do so. (Joint Conf. Com. Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.) pp. 25–26.) The augmented formula now "require[s] county auditors to reduce the tax base, upon which the allocation to qualifying cities is determined, by the amount of property tax revenues received by the cities' redevelopment agencies." (Off. of Local Government Affairs, Enrolled Bill Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) Sept. 9, 1988, p. 2.) The Legislature also added a provision that similarly requires county auditors to reduce the TEA of qualifying cities with "dependent special districts within their boundaries." (Id. at p. 5 [amendment "revises SB 709 by . . . adjusting the [(property tax)] shift to recognize redevelopment, and by reducing the shift to recognize tax cuts and special districts"].) In short, the 1988 amendments to the TEA statute revised "the property tax allocation provisions of [the preceding year] . . . to provide a more equitable solution to the long standing issue of shifting property tax revenues to no- and-low property tax cities."[8] (Off. of Local Government Affairs, Enrolled Bill Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) Sept. 9, 1988, p. 6.)

---

[7] Reflecting the political nature of distributing a finite pot of tax revenues, the TEA statute also has numerous, carefully crafted provisions affecting specific jurisdictions. (E.g., § 98, subds. (a) [Ventura County], (f)(4) [Rancho Mirage], (m)(2) [Santa Clara County]; see also §§ 98.01 [Los Angeles County], 98.02 [Ventura County], 98.1 [Orange County].)

[8] In 1994 and 1995, the Legislature passed additional legislation, now codified as section 96.15, ensuring that qualifying cities entitled to TEA under section 98 are not negatively impacted if they merge with a special district and continue to provide the services previously provided by the district through a municipal department. (Assem. Com. on Revenue & Taxation, Analysis of Sen. Bill No. 1563 (1995–1996 Reg. Sess.) as introduced Feb. 15, 1996, p. 2.) "[U]ntil 1994, counties could reduce their property tax payments to no- and low-property tax cities by the amount of property tax revenues allocated to a city-governed special district. [¶] In 1994, the City of Simi Valley (Ventura County) wanted to turn a city-governed sanitary district into a city department. However, under the property tax allocation laws, the city would have lost its no- and low-property tax payments from the county. In response, the Legislature protected cities' no- and low-property tax payments if the city merged with a city-governed subsidiary district (SB 1361, Wright, 1994). The 1994 law provided that a city would receive

3. *Educational Revenue Augmentation Funds (ERAF's)*

During the same period of time the Legislature was working to establish a more equitable allocation of property tax revenues, the state was also struggling with the complexities of public school funding. The history of this funding challenge is recited in detail in this court's opinion in *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1271–1276 [101 Cal.Rptr.2d 784] (*County of Sonoma*), and was more recently summarized in *Los Angeles Unified School Dist. v. County of Los Angeles* (2010) 181 Cal.App.4th 414, 419–422 [104 Cal.Rptr.3d 590] (*Los Angeles Unified School Dist.*). We cannot improve on the discussion in these cases, from which we quote: "Since 1971, the division of state and local responsibility for educational funding has 'been in a state of flux.' (*City of El Monte v. Commission on State Mandates* (2000) 83 Cal.App.4th 266, 278 [99 Cal.Rptr.2d 333].) The state's responsibility for educational funding has increased since 1971 for three primary reasons." (*Los Angeles Unified School Dist., supra*, 181 Cal.App.4th at p. 419.)

"First, in the 1970's, the California Supreme Court held that the state must ameliorate the disparities in local property tax-based educational funding. (*Serrano v. Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241]; *Serrano v. Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929].) Second, in 1978, the voters adopted Proposition 13, now article XIII A of the California Constitution, which limited local property taxation. (See, e.g., *County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442, 1450–1452 [29 Cal.Rptr.2d 103] . . . .) Finally, in 1988, the voters enacted Proposition 98, which established a minimum guaranteed state funding entitlement for schools. (Cal. Const., art. XVI, § 8, subd. (b) . . . .)" (*Los Angeles Unified School Dist., supra*, 181 Cal.App.4th at pp. 419–420.)

"The state's ability to meet its increased financial obligation to schools under Proposition 98 was severely tested in fiscal year 1991–1992, when the state 'faced an unprecedented budgetary crisis . . . with expenditures projected to exceed revenues by more than $14 billion.' (*Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 163 [6

---

all of the district's property tax revenues, but must continue to provide services . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1563 (1995–1996 Reg. Sess.) May 8, 1996, p. 2.) The 1995 legislation clarified and confirmed this directive. (*Ibid.*) At that time, according to the Legislative Analyst, there were "20 no-property tax cities and 72 low-property tax cities." (Assem. Com. on Revenue & Taxation, Analysis of Sen. Bill No. 1563 (1995–1996 Reg. Sess.) as introduced Feb. 15, 1996, pp. 1–2.) There was no breakdown, however, between the two subgroups of low-property-tax cities, i.e., pre-Proposition 13 cities that had adopted low property tax rates and post-Proposition 13 cities that had received only a small tax base in the formation process (i.e., "newly incorporated cities").

Cal.Rptr.2d 714].) In response to this economic crisis, the Legislature enacted the 1992 ERAF legislation, Revenue and Taxation Code former section 97.03 (presently § 97.2). The ERAF legislation lessened the burden imposed by Proposition 98 on the state General Fund by reducing the property tax allocation of cities, counties, and special districts, and shifting the amount of the reduction to ERAF's for distribution to schools." (*Los Angeles Unified School Dist., supra*, 181 Cal.App.4th at p. 420, fn. omitted.)

"The ERAF reallocation design can be summarized as requiring reduction of property tax revenues previously allocated to counties by use of a specified formula, deposit of the reduced amounts into ERAF's, and distribution of the ERAF funds to schools. Another portion of the same legislation deemed the ERAF revenues to be part of the state General Fund revenues for purposes of calculating the minimum educational funding guarantee under Proposition 98. The overall result of these statutes is that the tax revenues of the counties are decreased, school revenues remain the same, and the minimum school funding guarantee of Proposition 98 is satisfied in part by the ERAF funds. This legislative adroitness fulfilled the funding of Proposition 98 by reallocating available finite funds from one local governmental entity to another. (Legis. Analyst, Rep. to Joint Legis. Budget Com., analysis of 1993–1994 Budget Bill, p. 90.)" (*County of Sonoma, supra*, 84 Cal.App.4th at pp. 1275–1276, fns. omitted.)

The Legislature, however, did not view the ERAF legislation so much as a reshuffling of tax revenues, but as bringing to an end the state "bailout" of local governmental entities under Assem. Bill 8. (E.g., Governor's Off. of Planning & Research, Enrolled Bill Rep. on Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993, pp. 1–2 ["In order to balance last year's State budget, SB 617 [(ERAF I)] was enacted to begin the 'undoing' of the SB 154 and AB 8 bailout created in 1978–79."] and p. 3 ["SB 1135 [(ERAF II)] would complete the repeal of the SB 154 and AB 8 bailout by shifting [additional] . . . property tax revenues from local governments to the ERAF . . . ."].)

a. *ERAF I*

The first ERAF tax revenue shift (ERAF I), enacted in 1992, was implemented through two different statutory mechanisms, now codified as sections 97 and 97.2 (originally enacted as § 97.03, see Historical and Statutory Notes, 58D West's Ann. Rev. & Tax. Code (2009 ed.) foll. § 97.2, pp. 272–274]).

Section 97.2 effectuated a permanent reallocation of property tax revenues to the ERAF's. From each county, a statutorily specified amount of property tax revenue was reallocated to the ERAF created for that county. (§ 97.2,

subd. (a)(1).) From each city, 9 percent of its property tax revenue was reallocated to the local ERAF.[9] (§ 97.2, subd. (b)(1).) These reallocations were implemented by modifying the A.B. 8 allocation process. (See § 97.2 ["Notwithstanding any other provision of this chapter, the computations and allocations made . . . pursuant to Section 96.1 or its predecessor section [(the A.B. 8 statutes)] shall be modified . . . as follows . . . ."].) For each entity subject to the mandated reallocations, the county auditor was directed to deem the property tax revenues allocated to the entity in the previous fiscal year (fiscal year 1991–1992) to have been lower by the amount reallocated to the ERAF. (See § 97.2, subds. (a)(1), (b)(1) & (c)(1).) This reduced each entity's tax base for the 1992–1993 fiscal year. The property tax revenues not allocated to cities and counties through this "reduction" were allocated to the ERAF's. (Former § 97.5, subd. (d)(1), repealed Stats. 1994, ch. 1167, § 2, p. 6906.)

The base "reductions" and reallocations to ERAF's only had to be made once, for the 1992–1993 fiscal year. Thereafter, the impact on cities and counties was self-perpetuating through the A.B. 8 allocation process. (*Los Angeles Unified School Dist., supra,* 181 Cal.App.4th at p. 425 ["By incorporating the ERAF legislation into section 96.1's yearly allocation of property taxes, the Legislature implemented an annual shift of property taxes to ERAF's for distribution to the schools."].) The ERAF's, in turn, received a tax base through the mandated "reductions" and reallocations, and effectively became another entity receiving a share of the local property tax revenue through the A.B. 8 allocation process.

Section 97.2 specifically refers to the TEA statute. Subdivision (b)(4) states: "In the 1992–93 fiscal year and each fiscal year thereafter, the auditor shall adjust the computations required pursuant to Article 4 (commencing with section 98 [(the TEA statute)]) so that those computations do not result in the restoration of any reduction required pursuant to this section." (§ 97.2, subd. (b)(4).) This had the effect of making the ERAF tax revenue shift mandated by section 97.2 a deduction from the TEA allocation under section 98, which effectively reduced the amount of the TEA guarantee to qualifying cities to slightly less than 7 percent.

Section 97 employed a somewhat different approach to funding the ERAF's. This reallocation was based on population. Each county reallocated $1.92 per resident to the local ERAF, and each city reallocated $1.65 per resident. (§ 97, subd. (a)(1)–(2).) Like the reallocations under section 97.2, the reallocations required by section 97 were put into effect by deeming the property tax revenue allocations of the previous fiscal year to have been lower by the

---

[9] Other kinds of local governmental entities, such as special districts, were also subject to the ERAF shift. (E.g., § 97.2, subds. (c), (d)(1).)

amounts of the population-based reallocations, thus "reduc[ing]" the tax base. (§ 97, subd. (a).) The funds reallocated to ERAF's in the 1992–1993 fiscal year under section 97, however, were restored to the cities and counties in the 1993–1994 fiscal year. (§ 97, subd. (b).) Unlike section 97.2, section 97 contains no reference to the TEA statute.[10]

 b. *ERAF II*

The state's budget crisis and difficulty in meeting the school funding mandate of Proposition 98 continued, leading to the enactment of additional ERAF provisions the following year, in 1993 (ERAF II), now codified as sections 97.1 (enacted as § 97.02 [Stats. 1994, ch. 1167, § 3, p. 6906; Stats. 1993, ch. 68, § 9, p. 948]) and 97.3 (enacted as § 97.035 [Stats. 1994, ch. 1167, § 3, p. 6906]).

Section 97.1 required another reallocation of property tax revenues based on population. Each county was deemed for the previous fiscal year (fiscal year 1992–1993) not to have been allocated $0.78 per resident and each city was deemed not to have been allocated $0.99 per resident (§ 97.1, subd. (a)(1)), thereby "reduc[ing]" the tax base for counties and cities for the 1993–1994 fiscal year. The property tax revenues not allocated to the counties and cities because of their "reduc[ed]" tax bases were reallocated to the ERAF's. (§ 97.1, subd. (a)(2).) These reallocations are also perpetuated in future years through the A.B. 8 allocation process. (See § 97.1, subd. (a) ["Notwithstanding any other provision of this chapter, the computations and allocations made . . . pursuant to Section 96.1 or its predecessor section [(the A.B. 8 statutes)] . . . shall be modified . . . as follows . . . ."].) Section 97.1 contains no reference to the TEA statute.

Section 97.3, the second ERAF II statute, further "reduced" the local tax base for the 1993–1994 fiscal year. (§ 97.3, subds. (a)–(c).) The statute specified amounts certain—$1.998 billion from counties and $288 million from cities—by which the local tax base was to be deemed "reduced." (§ 97.3, subds. (a)(1), (b)(1).) It also directed the Director of Finance to parcel these amounts among counties and cities pursuant to complex formulas set forth in the statute. (§ 97.3, subds. (a)(2)(A)–(E), (b)(2)(A)–(E).) The formula applicable to cities specified among other things that "[t]he amount of property tax revenue that is estimated to be attributable in the 1993–94 fiscal year to the amount of the city's state assistance payment received by that city pursuant to Chapter 282 of the Statutes of 1979 [(the A.B. 8 'bailout' legislation)] shall

---

[10] The ERAF I property tax shift was also offset the first year (fiscal year 1992–1993) by a redirection of VLF's to cities and counties, often referred to as the "VLF Roundabout." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 617 (1991–1992 Reg. Sess.) Aug. 31, 1992, pp. 4–5.)

be determined." (§ 97.3, subd. (b)(2)(A).) The property tax revenues not allocated to the cities and counties because of their further "reduced" tax bases were reallocated to the ERAF's (§ 97.3, subd. (d)), and the effect of these "reductions" are carried forward through the A.B. 8 allocation process.[11] (See § 97.3 ["Notwithstanding any other provision of this chapter, the computations and allocations made . . . pursuant to Section 96.1 or its predecessor section [(the A.B. 8 statutes)] shall be modified . . . as follows . . . ."].) Like section 97.1, section 97.3 contains no reference to the TEA statute.[12]

### c. *ERAF III*

In 2004, more than 10 years after enactment of the initial ERAF statutes, the Legislature dramatically reduced the amount of VLF's payable to cities and counties from 2 percent to 0.65 percent of a vehicle's assessed value. (§§ 10752, 10752.1; Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 1096 (2003–2004 Reg. Sess.) as amended July 27, 2004, p. 1.) To ameliorate the effect of this loss of revenue, the Legislature enacted section 97.70, commonly referred to as the "VLF swap." (§ 97.70.)

Under section 97.70, counties essentially hold back from the allocation to ERAF's an amount of property tax revenues equivalent to the lost VLF revenue. (§ 97.70, subd. (a)(1)(A).) That property tax revenue is, instead, deposited in a "Vehicle License Fee Property Tax Compensation Fund" (VLF Fund). (§ 97.70, subd. (a)(2).) Counties then distribute the revenues in this fund to cities in place of lost VLF revenues. (§ 97.70, subd. (b)(1)(A)–(B); Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 1096 (2003–2004 Reg. Sess.) as amended July 27, 2004, pp. 2–3.) Section 97.70 specifically refers to the TEA statute and states: "This section shall not be construed to . . . [¶] . . . [¶] [r]educe ad valorem property

[11] The ERAF II revenue shift was partially ameliorated by the allocation of additional VLF's to the counties and cities. "The property tax revenue loss to cities, counties, and cities and counties is offset by allocations of $50 million annually in VLF revenues from delinquent VLF collections by the Franchise Tax Board." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993, p. 2.) In addition, "[f]or the 1993–94 fiscal year only, [the legislation] provides for an allocation of $130 million in VLF revenues to cities ($90 million) and counties and cities and counties ($40 million) to be disbursed in proportion to their respective shares of the total [$2.595 billion] property tax revenue reduction . . . ." (*Ibid.*)

[12] Also in 1993, California voters approved Proposition 172, which imposed a 0.5 percent state sales tax. (Cal. Const., art. XIII, § 35.) The Legislature then enacted Government Code sections 30051 to 30055, which distributed the sales tax revenues to counties and cities based on the section 97.3 reallocations of property tax revenues to the ERAF's. (Gov. Code, §§ 30054, 30055.) This effectively reimbursed local entities for some of the property tax revenues shifted under ERAF II.

tax revenue allocations required under Article 4 (commencing with Section 98 [(the TEA statute)]).'' (§ 97.70, subd. (f)(4).) This ensures that property tax revenues diverted from an ERAF to the VLF Fund to reimburse a qualifying city for lost VLF revenue are not construed as property tax receipts, but are instead treated as VLF revenue. Otherwise, the reimbursement would "increase" a qualifying city's property tax revenues, affecting its entitlement to TEA.

In conjunction with the VLF swap, the Legislature enacted another ERAF statute, section 97.71 (ERAF III). Unlike ERAF's I and II, which were implemented by modifying the A.B. 8 allocation process—that is, by "reducing" the local tax base by deeming the previous year's property tax allocation to have been smaller—ERAF III was implemented by modifying the VLF swap for fiscal years 2004–2005 and 2005–2006, thereby reducing the amount of VLF reimbursement to cities and counties. (§ 97.71, subds. (a)–(b); Legis. Counsel's Dig., Sen. Bill No. 1096 (2003–2004 Reg. Sess.) 6 Stats. 2004, Summary Dig., pp. 80, 82.) Thus, rather than cross-referencing the A.B. 8 allocation statutes (§§ 96.1, 96.5), the prefatory language of ERAF III states: "The total amount of revenue required to be allocated to each county and each city and county under Section 97.70 [(the VLF swap)] shall be reduced by the dollar amount . . ." specified in the statute. (§ 97.71, subd. (a)(1); cf. § 97.2 (ERAF I) ["Notwithstanding any other provision of this chapter, the computations and allocations made by each county pursuant to Section 96.1 or its predecessor section [(the A.B. 8 statutes)] shall be modified for the 1992–93 fiscal year . . . as follows . . . ."] & § 97.1, subd. (a) (ERAF II) ["Notwithstanding any other provision of this chapter, the computations and allocations made by each county pursuant to Section 96.1 or its predecessor section [(the A.B. 8 statutes)], as modified by Section 97.2 or its predecessor section for the 1992–93 fiscal year, shall be modified for the 1993–94 fiscal years as follows: . . . ."].) In short, ERAF III "took back" some of the reimbursement otherwise provided by way of the VLF swap.[13] (See § 97.71, subd. (c) [the "amount of revenue that is not allocated [under section 97.70] . . . shall be deposited in the county" ERAF].)

### 4. Redevelopment Agencies

This case not only involves the A.B. 8 statutes, the TEA statute and the ERAF statutes, it also touches on redevelopment. Cities and counties can establish a redevelopment agency to promote economic development within a designated area. (Health & Saf. Code, §§ 33100, 33101, 33120, 33131.) Once established, a redevelopment agency is a separate legal entity from the city or

---

[13] The County candidly described ERAF III as "part of a very complicated . . . smoke-and-mirrors transaction" designed to once again reshuffle tax revenues to meet mandatory funding obligations.

county that created it. (*Pacific States Enterprises, Inc. v. City of Coachella* (1993) 13 Cal.App.4th 1414, 1422–1424 [17 Cal.Rptr.2d 68].)

The activities of a redevelopment agency are generally funded by what is called tax-increment financing. (See Cal. Const., art. XVI, § 16; Health & Saf. Code, § 33670; *Los Angeles Unified School Dist., supra*, 181 Cal.App.4th at p. 421.) The tax increment is the increase in property tax revenues that occurs in a redevelopment area after the creation of a redevelopment agency. (Health & Saf. Code, § 33670, subd. (b); *Los Angeles Unified School Dist.*, at p. 421.) In tax-increment financing, the tax increment is allocated to the redevelopment agency and used to fund its redevelopment activities. (Cal. Const., art. XVI, § 16; Health & Saf. Code, § 33670; see *Los Angeles Unified School Dist.*, at pp. 421–422.)

Until 1994, a redevelopment agency could enter into "pass-through" agreements with entities within its redevelopment area that had previously received a share of the property tax revenues. Under such agreements, an agreed amount of the tax increment was passed through to such entities and not retained by the redevelopment agency. (See former subd. (b) of Health & Saf. Code, § 33401, repealed by Stats. 1993, ch. 942, § 23, p. 5358.) Such agreements resulted in significant amounts of " 'local property taxes [being] diverted to redevelopment activities,' " with an attendant significant " 'cost [to] the state General Fund.' " (Historical and Statutory Notes, 41A West's Ann. Health & Saf. Code (1999 ed.) foll. § 33607.5, p. 173, quoting Stats. 1995, ch. 141, § 1, p. 543.) " 'The Community Redevelopment Law Reform Act of 1993 replaced negotiated agreements with a statewide formula to provide all cities, counties, special districts, and schools affected by redevelopment project areas a set percentage of their anticipated property tax revenues.' " (*Ibid.*) Accordingly, since 1994, the redevelopment tax increment has been passed through to taxing entities within a redevelopment area under a statutorily specified formula. (Health & Saf. Code, § 33607.5; *Los Angeles Unified School Dist., supra*, 181 Cal.App.4th at p. 422.) With this statutory overview, we turn to the dispute between the City and County.

## B. *The Dispute Between the City and County*

The City is a "qualifying city" under the TEA statute, and in December 1995, the Santa Cruz County Auditor-Controller notified the city manager by letter that the City would be receiving property tax revenues under the TEA statute for the 1995–1996 fiscal year. However, two months later, in February 1996, the Auditor-Controller advised the city manager by letter that the Auditor-Controller's office had discovered it had "erred in the calculation of the City . . . as a no/low property tax city under the Tax Equity Allocation formula (TEA)." The Auditor-Controller explained that an audit by the State

Controller's Office (SCO) had found the "base revenue" amount did not reconcile with "the actual revenue report." "To respond," the Auditor-Controller's office had "examined the TEA computation," which had been done *"prior* to the enactment of the ERAF legislation and *before* the inception of the Scotts Valley Redevelopment Agency" (SVRA). (Italics added.)

With respect to the ERAF issue, the Auditor-Controller stated his office had found "an error on [*sic*] the computation relating to the amount of Education Revenue Augmentation Fund adjustment to the TEA basis." Stating that his office had "consulted other county tax professionals" and legal counsel, the Auditor-Controller provided an explanation of the error that characterized ERAF I as having been "amended one [*sic*] in 1992" and "reenacted in its present form . . . in 1994" (apparently as ERAF II). With respect to the redevelopment issue, the Auditor-Controller stated his office had found an "omission of Scotts Valley Redevelopment Agency allocations." Specifically, "base revenue reduction of redevelopment agency funds had not been computed according to . . . Section 98 (c)" (the amended TEA formula requiring that redevelopment increment be taken into account).

Under its revised ERAF and redevelopment increment analyses, the Auditor-Controller projected the City was not likely to receive TEA in the foreseeable future and requested repayment of the TEA it had received the preceding year. The city manager accepted the Auditor-Controller's explanation, and did not take the matter to the city council.

The following year, in March 1997, the SCO issued its audit report for the audit to which the county Auditor-Controller had referred in his letter to the City.[14] The report stated, among other things, that the County had "used an incorrect base when computing the tax equity allocation (TEA) adjustment for one city." As to this finding—"Finding No. 1"—the report recommended "[t]he county should recompute the TEA formula adjustments to conform with the Revenue and Taxation Code." No other directions were given. The report also set forth the County's "Response" to Finding No. 1—that it was "a little misleading. The state auditor felt an error could exist and accordingly we reviewed the matter and discovered that the creation of a new Redevelopment Agency was not taken into account. We identified the amount of overpayment and provided a process for recovery . . . ."[15]

---

[14] The audit was for fiscal years 1987–1988 through 1994–1995.

[15] None of the other audit findings were specific to the City. While the report stated the County had "incorrectly computed the amount to be shifted to the" local ERAF, the identified problems were that the County had failed to make the per capita reduction required under section 97 (ERAF I) and failed to correctly compute the ERAF contribution of special districts, neither of which pertained solely to the City.

In 2006, either the mayor or a councilman alerted the city manager that other cities were claiming a right to TEA and asked the city manager to investigate. In September 2006, the City's finance director sent a letter to the county Auditor-Controller asking whether the TEA formula was being properly applied to the City. Within a couple of weeks, the Auditor-Controller responded the City was not entitled to TEA. The finance director did not, at that point, understand the Auditor-Controller's methodology for concluding the City was not entitled to TEA. Only after a number of conversations, did the finance director come to understand how the County was analyzing the issue.

In June 2007, the City filed a combined petition for writ of mandate and complaint for declaratory relief in the Santa Cruz Superior Court alleging four causes of action against the County, all based on the claim the Auditor-Controller was not properly applying the TEA statute and had failed to allocate to the City all the property tax revenues to which it was entitled. Even though the City was a qualified city under section 98 entitled to receive approximately 7 percent of the property tax revenues paid by its residents, the City alleged it was receiving only between 3.5 and 4.5 percent of the local revenues. This was happening because in determining the comparative A.B. 8 allocation figure, the Auditor-Controller was deeming the City to have been allocated (a) property tax revenues that were actually allocated to and received by the county ERAF and (b) redevelopment tax increment actually allocated to and received by the SVRA. This resulted in the comparative A.B. 8 allocation figure being higher than the TEA formula allocation figure, which resulted in the City being allocated property tax revenues under the A.B. 8 statutes, rather than under the TEA statute.

The County answered and denied any misapplication of the property tax statutes, and subsequently filed a cross-complaint against the City and the SVRA. The case was then transferred to the San Mateo Superior Court. The County and the Santa Cruz County Redevelopment Agency subsequently filed a combined second amended cross-complaint for breach of contract, damages, and declaratory relief against the City and the SVRA and a petition for writ of mandate against the State Controller.

While the dispute between the City and County was developing, the SCO was conducting another audit of the County.[16] According to a senior management auditor with the SCO responsible for supervising audits pertaining to the allocation of property taxes, "the audit scopes . . . indicate[d] that the SCO did not consider any TEA computations at all." Rather, the only statement about TEA in the subsequently issued audit report dated July 2008 was that: "In the past, SCO auditors have accepted the County's TEA formula

---

[16] This audit was for fiscal years between July 1, 2001, and July 1, 2006.

computation. However, the legal challenge in the County has raised the possibility that it may not be in compliance with the Revenue and Taxation Code. At this time, this finding does not warrant a reportable condition, but is only an observation until the legal issues are resolved." The report took no position on the issues, stating that after the conclusion of the litigation, "this process will be reviewed again to determine if any adjustments or corrections are warranted and the report will be modified accordingly."

The parties stipulated to bifurcate the trial on the writ petitions and filed extensive memoranda, declarations and exhibits in support of their respective positions. They also agreed the issues boiled down to whether ERAF's II and III "apply" to qualifying cities entitled to TEA under section 98 and whether tax increment allocated to a redevelopment agency should be included in the comparative A.B. 8 allocation figure. After an all-day hearing, the trial court granted the City's petition for a writ of mandate.[17]

The court ruled the County had misapplied the relevant statutes and the City had not received all the property tax revenues to which it was entitled under the TEA statute. However, the court rejected the City's claim it was entitled to recoup tax revenues back to the 2001–2002 fiscal year, agreeing with the County that the three-year limitations period set forth in Code of Civil Procedure section 338 applied and the City could recover revenues only back to the 2003–2004 fiscal year. The court ordered $292,113 be reallocated to the City for the 2003–2004 fiscal year, $423,353 for the 2004–2005 fiscal year, $464,344 for the 2005–2006 fiscal year, and $377,727 for the 2006–2007 fiscal year.[18] The court further ordered the reallocation to be made in equal payments over three years, and the County to calculate future TEA in accordance with the court's ruling, absent a change in the controlling law.

In so ruling, the trial court rejected the County's affirmative defense that in 1997 the SCO had "directed" the Auditor-Controller to use the methodology for determining the comparative A.B. 8 allocation figure challenged by the City. The court pointed out Finding No. 1 in the March 1997 SCO audit report said nothing about the comparative A.B. 8 allocation figure or the effect of the ERAF statutes, but only instructed the County to "recompute the *TEA formula* adjustments [set forth in section 98, subdivision (c)] to conform with the Revenue and Taxation Code." (Italics added.) The court also rejected the County's numerous equitable defenses that the City should be barred

[17] We commend the trial court for its superb handling of this complex case, including its thorough command of the issues upon short notice and its generosity of time in affording counsel full opportunity to present and argue the case.

[18] The parties stipulated to the numbers underlying the property tax allocations to the City for the 2003–2004 through 2006–2007 fiscal years, and the County provided calculations consistent with the court's ruling as to the 2007–2008 and 2008–2009 fiscal years.

from pursuing its claims because of the passage of time and alleged acquiescence in the Auditor-Controller's annual allocation determinations. The court additionally denied the County's petition for a writ of mandate requiring the SCO to eliminate the note in its July 2008 audit report about the pending litigation and to issue a "clean" report.[19]

After the parties failed to reach an agreement that would allow for dismissal of all claims and entry of final judgment, the trial court stayed issuance of a writ against the County pending appellate review. It also made a determination pursuant to Code of Civil Procedure section 166.1 that the case presents a controlling question of law involving legal issues of statewide importance that would benefit from immediate appellate review. However, rather than filing an original writ proceeding challenging the trial court's rulings, the County filed a notice of appeal. As we noted at the outset, both parties have requested that we deem the County's improper appeal to be an original writ proceeding. We agree with the trial court that this is a case in which immediate appellate review is warranted, and therefore deem the County's appeal to be a petition for a writ of mandate challenging the trial court's ruling that the County has misapplied the TEA statute and a directive that the County change its methodology for determining the comparative A.B. 8 allocation figure and reallocate property tax revenues to the City. (See *Olson v. Cory* (1983) 35 Cal.3d 390, 401 [197 Cal.Rptr. 843, 673 P.2d 720]; *H. D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1366–1367 [118 Cal.Rptr.2d 71].)

### III. Discussion

#### A. Standard of Review

■ We have granted writ review of the trial court's order granting the City's petition for a writ of ordinary mandamus. "A traditional writ of mandate under Code of Civil Procedure section 1085 is a method for compelling a public entity to perform a legal and usually ministerial duty. [Citation.] The trial court reviews an administrative action pursuant to Code of Civil Procedure section 1085 to determine whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, or whether the agency failed to follow the procedure and give the notices the law requires." (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995 [109 Cal.Rptr.2d 454], fn. omitted; accord, *Shelden v. Marin County Employees'*

---

[19] The SCO asserted, and the trial court agreed, the State Controller has no mandatory duty to examine any TEA determinations in any given audit and therefore could not be compelled to remove the qualifying note from the audit report (or, more specifically, to take a position on the issues before the court).

*Retirement Assn.* (2010) 189 Cal.App.4th 458, 463 [116 Cal.Rptr.3d 883].) The trial court reviews legal questions, including questions of statutory construction, de novo. (See *Shelden, supra,* at p. 463; *Clovis Unified School Dist. v. Chiang* (2010) 188 Cal.App.4th 794, 798 [116 Cal.Rptr.3d 33].)

Appellate review in an ordinary mandamus proceeding " 'is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence.' " (*Agosto v. Board of Trustees of Grossmont-Cuyamaca Community College Dist.* (2010) 189 Cal.App.4th 330, 336 [118 Cal.Rptr.3d 300], quoting *Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352].) However, a Court of Appeal engages in de novo review " 'when the case involves resolution of questions of law where the facts are undisputed.' " (*Agosto,* at p. 336, quoting *Saathoff,* at p. 700; accord, *Schram Construction, Inc. v. Regents of University of California* (2010) 187 Cal.App.4th 1040, 1051–1052 [114 Cal.Rptr.3d 680].) Accordingly, we also review the questions of statutory construction presented in this case de novo. (See *Margarito v. State Athletic Com.* (2010) 189 Cal.App.4th 159, 166 [116 Cal.Rptr.3d 888]; *Farahani v. San Diego Community College Dist.* (2009) 175 Cal.App.4th 1486, 1491 [96 Cal.Rptr.3d 900].)

B. *Statute of Limitations*

We first consider the County's arguments that the City's property tax allocation claims are time-barred, thus precluding consideration of the merits. As we have recited, the trial court ruled the three-year statute of limitations set forth in Code of Civil Procedure section 338 applies to the City's claims, barring recovery for fiscal years prior to the 2003–2004 fiscal year. In the trial court, the County advocated this result. However, on appeal, the County contends the three-year statute commenced running more than a decade earlier, although at different times, on what it calls the City's "ERAF II" and "redevelopment" allocation claims. While now couched as statute of limitations arguments, what the County has done on appeal is repackage the equitable defenses it raised in the trial court, all of which the trial court rejected. We conclude the County cannot reverse course on appeal and is barred from raising its new statute of limitations arguments by the doctrine of invited error. Even were that not the case, we further conclude the County's new limitations arguments are without merit.

1. *The County's Arguments in the Trial Court*

In the trial court, the County asserted the City's claims were barred by the 60-day period for bringing a "validation action" (Code Civ. Proc., § 860; Gov. Code, § 53511), which it maintained began running at the close of each fiscal

year. The County alternatively asserted the three-year period in Code of Civil Procedure section 338 applied. The County maintained under that statute, "liability cannot extend, as a matter of law, backwards beyond Fiscal Year 2003–04." The City responded that neither the 60-day, nor the three-year, period applied and the applicable limitations period was set forth in section 96.1, which bars the reallocation of property taxes for years that have been audited by the State Controller and for which all findings have been resolved. The trial court rejected the County's argument that the validation statutes applied, but *agreed* with the County that Code of Civil Procedure section 338 applies and bars claims for fiscal years prior to 2003–2004.

In addition to its statute of limitations defenses, the County raised a host of equitable defenses, which it repeatedly characterized as such and treated as distinct from its limitations defenses. The County first invoked the doctrine of laches. It asserted the City's claims "would have existed" by the 1995–1996 fiscal year since the SVRA was operative, ERAF II was in effect, and the City had been told by the Auditor-Controller that, in light of a state audit, he had changed his determination that the City was entitled to TEA. The County further asserted the city manager had been told the SCO had instructed the County to use the challenged methodology for determining the A.B. 8 comparative allocation figure and posited the City made a "decision to accept the SCO's determination" for "strategic" reasons. The County suggested these reasons had to do with financial difficulties being experienced by the SVRA, which the City addressed in part by renegotiating a passthrough agreement between the SVRA and the County. The County claimed that had the City challenged its methodology for determining the comparative A.B. 8 allocation figure, it "would not have agreed to any renegotiation" of the passthrough agreement, "much less the terms and conditions" that were reached. Thus, the County maintained it had been prejudiced by the City's asserted "decision to acquiescene [*sic*] and accept the determinations of the SCO and the [County] Auditor in 1996." It additionally claimed it was prejudiced because the City had accepted Proposition 172 sales tax revenues channeled to local governmental entities to offset the ERAF II shift of property tax revenues. The County further asserted the "facts" underlying its laches defense supported denying relief to the City under the "doctrines of unclean hands, failure to exhaust administrative remedies, estoppel, and, waiver."

The City disputed the County's assertions and objected, on speculation grounds, to all of the County's evidence as to what it "would have done" had the City, in 1996, challenged the way in which the County determined the comparative A.B. 8 allocation figure. The City also claimed that had it had any negotiating "strategy" in mind, it would have filed suit as soon as the passthrough agreement was renegotiated. Further, any legal right had to be waived by the city council, and could not be waived by the alleged "acquiescence" of the city manager. And even if the city council had

understood the City had a right to TEA and knowingly failed to pursue it—of which there was no evidence—the law holds that "as with estoppel, laches is not available where it would nullify an important policy adopted for the benefit of the public." (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1381 [56 Cal.Rptr.3d 591].) The City maintained the Legislature's enactment of the TEA statute represented an important policy decision infusing a degree of fairness into the complicated morass of property tax allocation for the benefit of taxpayers residing in no- and low-property-tax cities. Also, far from being prejudiced, the City claimed the County had received millions in property tax revenues to which it was not entitled.

The trial court sustained the City's objections to the County's evidence and thus ruled the County had failed to support its laches defense with a concise statement of the law and relevant evidence as required by California Rules of Court, rule 3.1113(b), and also had failed to meet its burden of showing prejudice.[20]

The County additionally based a number of equitable defenses on Finding No. 1 in the SCO's March 1997 audit report. Characterizing the finding as a directive to utilize the challenged methodology for determining the comparative A.B. 8 allocation figure, the County asserted the Auditor-Controller "neither possessed discretion nor was legally entitled" to do anything different and therefore there was no different "ministerial action" that could be enforced by a writ of mandate. The County acknowledged a writ of mandate can generally issue when a taxing authority or official fails to act in accordance with the law. However, it claimed that "due to the unique facts associated with the 1997 SCO Audit," the Auditor-Controller "possessed no legal option" to do anything other than use the challenged methodology to determine the comparative A.B. 8 allocation figure. (Emphasis omitted.) The County therefore asserted that if the trial court ruled against it on the statutory allocation issues, the appropriate remedy was declaratory relief, not a writ of mandate.

The County also asserted the City had "waived" its claims against the County by failing to "administratively contest" or seek "judicial review" of Finding No. 1 and by "acquiesc[ing]" in that finding "by seeking an extended repayment plan" from the Auditor-Controller to repay previously allocated TEA. The County similarly argued the City was barred from pursuing its claims by "administrative collateral estoppel." The County claimed the City could have, and should have, taken issue with Finding No. 1 directly with the State Controller, and the Auditor-Controller was bound to adhere to that finding on a going-forward basis.

---

[20] The County has not taken issue with the trial court's evidentiary ruling on appeal.

The City responded there was, again, no evidence the city council knowingly forfeited any rights under the TEA statute. And even if there was, public officials and public agencies cannot alienate public rights by " 'mere failure to assert such rights [o]n behalf of the public which they represent.' " (*City of Santa Cruz v. Pacific Gas & Electric Co.* (2000) 82 Cal.App.4th 1167, 1177–1180 [99 Cal.Rptr.2d 198]; see Civ. Code, § 3513.) The City also asserted the Auditor-Controller was obligated to comply with the relevant statutes and could not avoid issuance of a writ compelling such compliance by claiming he/she was acting at the direction of the State Controller. The City further claimed the County had failed to establish, and could not establish, that Finding No. 1 "required" the Auditor-Controller to use the methodology for determining the comparative A.B. 8 allocation figure challenged by the City.

In rejecting the County's equitable defenses based on Finding No. 1, the trial court first ruled the County had not identified any authority that it was "under a duty to follow the findings in the SCO audit report" that could excuse it from complying with the controlling property tax statutes. The court secondly ruled Finding No. 1 was not a directive that the County utilize the challenged methodology for determining the comparative A.B. 8 allocation figure. Specifically, the court found: "[A]lthough the County states otherwise, there is no apparent 'directive' regarding the methodology to be used in calculating the AB8 amount in Finding No. 1 of the SCO's 1997 report. Finding No. 1 noted that the county had used an incorrect tax base property tax amount to calculate the *TEA formula* adjustment because it had failed to take into account the City RDA. There is no discussion of ERAF or the AB8 calculation. The SCO's recommendation for Finding No. 1 was 'The County should recompute the *TEA formula* adjustments to conform with the Revenue and Taxation Code.' [¶] The County has failed to demonstrate to the Court that (1) it was following the direction of the SCO in computing the tax allocations or (2) that it had a duty to do so." (Italics added.) The court further found that, since Finding No. 1 "only recommends that the County Auditor recompute the TEA formula in accordance with the Revenue and Taxation Code," there was no reason for the City to have challenged the finding. As for the City's agreement to repay "the extra TEA amount it had been paid as a result of the County Auditor's failure to deduct the tax increment paid to the City RDA from the TEA base," the court found it did not show the City "knowingly gave up its right to pursue any misallocation by the County or mistake in calculating the AB 8 amount."

The trial court rejected the County's administrative estoppel argument for the additional reason the County had not established, and could not establish, all the requisite elements to impose such an estoppel. The County could not show that, in auditing the county, the SCO had acted in a "judicial capacity" and rendered an adjudicatory decision. Nor could it show the State Controller

has authority to administratively adjudicate a dispute between a county and a city therein, or that the City had had an opportunity to fairly and fully litigate its claims against the County in the course of the audit.

### 2. The County's Arguments on Appeal

While the County agrees the three-year statute of limitations under Code of Civil Procedure section 338 applies, it now contends the three-year period commenced running (a) on July 9, 1993, as to the City's ERAF II allocation claims and (b) in 1997, as to the City's redevelopment allocation claims.[21]

The County bases its first argument on the assertion the Auditor-Controller had a "ministerial obligation to comply" with a July 9, 1993, letter sent by the Department of Finance (DOF) to county auditors informing them of the amounts by which local governmental tax bases were to be deemed "reduced" under ERAF II.[22] Because an amount was specified for the City, the County claims the letter was a "determination of the DOF" that the City "bore the economic responsibility for the ERAF II Shift." It asserts the City was required to challenge "this 1993 directive" within three years.

The County bases its second argument on the facts proffered in support of its laches defense in the trial court: the SVRA was operative by the 1995–1996 fiscal year, the City was allegedly told during that timeframe the County had been instructed by the SCO to use the challenged methodology for determining the comparative A.B. 8 allocation figure, and the Auditor-Controller was required to comply with Finding No. 1 in the SCO March 1997 audit report, which the County continues to assert "directed" the Auditor-Controller to use the challenged methodology. The County contends the City was required to "challenge the [1997] SCO determination" within three years.

As a general rule, theories not raised in the trial court cannot be raised for the first time on appeal. This is a matter of fundamental fairness to both the trial court and opposing parties. (*People ex rel. Dept. of Transportation v. Superior Court* (2003) 105 Cal.App.4th 39, 46 [129 Cal.Rptr.2d 60].) There are exceptions to this rule, including where a new theory pertains only to questions of law based on undisputed facts. (*Sheller v. Superior Court* (2008)

---

[21] The County does not appear to take issue with the trial court's limitations ruling with respect to the City's claim that ERAF III also does not apply to qualifying cities entitled to TEA under section 98.

[22] As we have discussed, ERAF II embraced two "reductions" to the previous year's tax base, one based on specified economic amounts multiplied by population (§ 97.1) and the other based on a share of an amount certain determined by a complex formula applied by the Director of Finance. (§ 97.3, subds. (a)–(c).)

158 Cal.App.4th 1697, 1709 [71 Cal.Rptr.3d 207].) But even then, whether an appellate court will entertain a new theory raised for the first time on appeal is strictly a matter of discretion. (See *Hussey-Head v. World Savings & Loan Assn.* (2003) 111 Cal.App.4th 773, 783, fn. 7 [4 Cal.Rptr.3d 171].) Moreover, where a new theory contemplates a factual situation that is " 'open to controversy' " and was not placed at issue in the trial court, it cannot be advocated on appeal. (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184].) Likewise, when a party bears some responsibility for the claimed error, they are generally estopped from taking a different position on appeal or are deemed to have waived the error. (E.g., *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [87 Cal.Rptr.2d 453, 981 P.2d 79] [estoppel]; *Telles Transport, Inc. v. Workers' Comp. Appeals Bd.* (2001) 92 Cal.App.4th 1159, 1167 [112 Cal.Rptr.2d 540] [waiver].) "[W]here a deliberate trial strategy results in an outcome disappointing to the advocate, the lawyer may not use that tactical decision as the basis to claim prejudicial error." (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1686 [12 Cal.Rptr.2d 279].)

Given the state of the record here—including that the County urged the trial court to apply the three-year limitations period in Code of Civil Procedure section 338 and affirmatively represented the consequence would be the preclusion of claims based on fiscal years prior to fiscal year 2003–2004—we conclude the County invited the error of which it now complains and thus is estopped to assert, or has waived, the contrary arguments it now advances on appeal, i.e., that the three-year statute began running years earlier and is a complete bar to the City's ERAF II and redevelopment claims.[23]

Even if the arguments were properly before us, we would reject them. As to the County's first argument directed at the City's ERAF II claims, there is no evidence in the record, for example, that in making the calculations required under ERAF II and communicating those numbers to the counties, the DOF even had in mind, let alone intended anything by implication, with respect to the alternative allocation system established by section 98. There, likewise, is no evidence as to what the governing body of the City knew or understood about the July 9, 1993, letter from the DOF to county auditors concerning the ERAF II "reductions." Accordingly, we disagree with the County's assertion that the DOF's July 1993 letter was a "fundamental decision" as to the City's entitlement to TEA under section 98. Citing *Dillon v. Board of Pension Commrs.* (1941) 18 Cal.2d 427 [116 P.2d 37] (*Dillon*), the

---

[23] The one passing reference to the three-year statute buried in the middle of the County's waiver argument in its trial court memorandum—of which no mention was made in any of its other equitable defense arguments (laches, unclean hands, performance of ministerial duty, and administrative estoppel) or at the day-long hearing—did not preserve the County's new statute of limitations arguments and is insufficient to avoid the doctrine of invited error.

County argues the DOF's 1993 letter was the equivalent of a pension board's decision denying an application for a pension, which must be challenged within three years. We see no similarity, including because an *applicant* for a pension takes the affirmative step of applying for such and *receives notice* of an adverse decision on his or her application. Here, the City had no part in triggering the DOF's letter, and there is no evidence as to what, if any, notice the City had with respect to the letter.[24]

As for the County's second argument—that the City's redevelopment claims are time-barred—we agree with the trial court that the County did not establish that the City was told in 1997 that the County had been directed by the SCO to use the challenged methodology for determining the comparative A.B. 8 allocation figure. To begin with, as the trial court found, Finding No. 1 in the March 1997 SCO audit report did no more than direct the County to "recompute the TEA formula adjustments to conform with the Revenue and Taxation Code." As we have discussed, the "TEA formula" means the six-step formula set forth in the TEA statute. (§ 98, subd. (c).) Finding No. 1 said nothing about the method for determining the comparative A.B. 8 allocation figure, let alone the inclusion in that comparative calculation of property tax revenues allocated to the SVRA. In addition, the Auditor-Controller's 1996 letter to the city manager referring to the then ongoing audit and explaining the problem the Auditor-Controller's office had discovered with respect to redevelopment stated (a) the office had failed to account for the SVRA *at all* and (b) the *TEA statute* required that redevelopment be taken into account, citing to section 98, subdivision (c). The Auditor-Controller's letter to the City is, thus, entirely consistent with the language of Finding No. 1 requiring the County to comply with the Revenue and Taxation Code. Accordingly, it cannot reasonably be said Finding No.1 either directed the county Auditor-Controller to use the method for determining the comparative A.B. 8 allocation figure now challenged by the City, or alerted any City official, let alone the City's governing body, that the Auditor-Controller had been so directed.[25] We therefore turn to the merits of the property tax allocation issues before us.

---

[24] The Supreme Court also held in *Dillon* that a potential applicant cannot avoid the statute of limitations by not filing an application. Accordingly, because the surviving wife in that case waited more than three years to even apply for pension benefits, any claim against her deceased husband's employer for such was time-barred. (*Dillon, supra,* 18 Cal.2d at pp. 430–431.) Here, the County's new limitations argument is predicated on an asserted "determination" by the DOF that supposedly triggered the three-year limitations period, not on any failure by the City to submit some kind of application to the DOF.

[25] This was also the State Controller's position in opposing the County's cross-writ petition. The Controller acknowledged that while "it is technically true that the Controller directed the County to revise its method of calculation of TEA payments in the 1997 audit report, the Controller, in actuality, merely directed the County to recompute the TEA formula adjustments *to conform with the Revenue and Taxation Code.* No other directions were given in the audit recommendation." The County insists, however, that in conferences with SCO personnel, the

## C. *The TEA Statute*

### 1. *The County's Comparative TEA and A.B. 8 Allocation Figures*

■ As we have discussed, whether a qualifying city is entitled to TEA under section 98 depends on a comparative analysis of allocation under the A.B. 8 statutes and under the TEA statute. If the TEA allocation figure is higher, property tax revenues are allocated in accordance with section 98; if the A.B. 8 figure is higher, revenues are allocated in accordance with sections 96.1, 96.2 and 96.5. The City and County do not disagree as to the figure the County derives under the six-step TEA formula set forth in section 98. Rather, the parties' disagreement arises with respect to the way the County arrives at the comparative A.B. 8 allocation figure, which has resulted in that figure being higher than the TEA allocation figure and the City being allocated property tax revenues under the A.B. 8 statutes, rather than the TEA statute.

When determining the City's comparative A.B. 8 allocation figure, the County deems the City to have been allocated in the preceding fiscal year (a) all of the property tax revenues generated within its municipal boundaries that were allocated to the County ERAF and (b) part of the property tax increment occurring within its municipal boundaries that was allocated to the SVRA. The City points out that while the County "allocates" these tax revenues to the City for purposes of determining the comparative A.B. 8 allocation figure, the City does not, in fact, receive these tax revenues. Rather, these revenues are actually allocated to and received by the County ERAF and the SVRA. As a result, even though it is a qualifying city and entitled under section 98 to 7 percent of the property taxes paid by its residents, it has actually received only 3.5 to 4.5 percent of the local tax revenues. The City agrees property tax revenues shifted under ERAF I are properly allocated to it for comparative purposes, but contends the County's comparative A.B. 8 methodology is otherwise contrary to the relevant statutes.

The County, on the other hand, asserts that if it did not take into account in the comparative A.B. 8 allocation figure all the ERAF amounts, the City would not bear the economic burden of these revenue shifts. The County includes the ERAF amounts, in other words, to ensure that all three ERAF shifts "apply" to the City. The County similarly contends that if it did not take into account the redevelopment tax increment, the City would avoid what the County calls the City's "redevelopment contribution" to the SVRA.

---

Auditor-Controller was told to use the challenged methodology for determining the comparative A.B. 8 allocation figure. Regardless of whether that was so, Finding No. 1 did not say that. Nor can such a directive be fairly divined from the letter the Auditor-Controller sent to the City.

The County describes its overall approach as comparing a "gross," rather than a "net," A.B. 8 allocation figure with the TEA figure. It maintains this approach has been used by county auditors for years, with the tacit, if not explicit, approval of the State Controller.

### 2. The ERAF Statutes

#### a. The Plain Language of the Statutes

 " 'The basic rules of statutory construction are well established. "When construing a statute, a court seeks to determine and give effect to the intent of the enacting legislative body." [Citation.] " 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." ' " (*Catlin v. Superior Court* (2011) 51 Cal.4th 300, 304 [120 Cal.Rptr.3d 135, 245 P.3d 860].) In that case, " ' " 'there is no need for construction and courts should not indulge in it.' " ' " (*People v. Palacios* (2007) 41 Cal.4th 720, 728 [62 Cal.Rptr.3d 145, 161 P.3d 519].) Thus, if the language is unambiguous, the plain meaning governs and it is unnecessary to resort to extrinsic sources to determine legislative intent. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 [129 Cal.Rptr.2d 811, 62 P.3d 54].)

The City contends the plain language of the relevant statutes resolves the question at hand—do qualifying cities entitled to TEA under section 98 share the burden of the ERAF II and ERAF III tax revenue shifts, as well as the ERAF I shift? The City says "no," pointing to the difference in language between ERAF I, and ERAF's II and III. As we have noted, subdivision (b)(4) of section 97.2 (ERAF I), states: "In the 1992–93 fiscal year and each fiscal year thereafter, the auditor shall adjust the computations required pursuant to Article 4 (commencing with Section 98) so that those computations do not result in the restoration of any reduction required pursuant to this section." (§ 97.2, subd. (b)(4).) The City and County agree this is an explicit directive that qualifying cities entitled to TEA under section 98 are not to be spared the burden of the ERAF I property tax shift.

The City observes this directive expressly pertains to the tax shift required by "this" section, i.e., section 97.2, and that neither ERAF II nor ERAF III has any like subdivision. (Compare § 97.2 with §§ 97.1, 97.3, 97.70.) The City therefore concludes no similar directive applies to ERAF's II and III and the County has erred in applying these two statutes as though they did contain such a directive. (See *Miklosy v. Regents of University of California*

(2008) 44 Cal.4th 876, 896 [80 Cal.Rptr.3d 690, 188 P.3d 629] [" '[W]hen the Legislature uses a critical word or phrase in one statute, the omission of that word or phrase in another statute dealing with the same general subject generally shows a different legislative intent.' "].) If the Legislature had intended that ERAF's II and III apply to qualifying cities entitled to TEA under section 98, it could have and would have said so, as it did in ERAF I. (See *Pearl v. Workers' Comp. Appeals Bd.* (2001) 26 Cal.4th 189, 197 [109 Cal.Rptr.2d 308, 26 P.3d 1044] [if Legislature had wanted statute to apply "it could have easily so stated"].)

The County does not dispute only ERAF I contains language making the tax shift applicable to qualifying cities, but asserts this makes sense in light of the overall statutory scheme. The County contends the relevant statutes should be viewed as a "statutory hierarchy," with the "section 97" statutes creating the ERAF's at the apex, "section 98" following thereafter, and the "section 96" statutes establishing the A.B. 8 allocation system anchoring the overall allocation scheme. The County further asserts that to the extent these statutes do not all "fit . . . together," one group must "prevail." And that group, says the County, must be the ERAF statutes; thus, the County's claim that the "ERAF reigns supreme."

The County points out sections 97.2 (ERAF I), 97.1 (ERAF II) and 97.3 (ERAF II) all begin with the proviso "[n]otwithstanding any other provision of this chapter . . ." (§§ 97.1, subd. (a), 97.2, 97.3) and that this "chapter," chapter 6, includes section 98. Section 97.71 (ERAF III) similarly commences "[n]otwithstanding any other provision of law . . . ." (§ 97.71.) The County thus maintains the ERAF statutes contain prefatory "supremacy" language giving them priority over the TEA statute, which contains no such language. The County further asserts that since ERAF I contains both "supremacy" language and an express directive that it applies to qualifying cities entitled to TEA under section 98, it set the general framework for the ERAF statutes. Ergo, there was no need for ERAF's II and III to contain anything more than the same kind of "supremacy" language to also—by implication—apply to qualifying cities.

The County notes the introductory language of ERAF II also goes on to state, "the computations and allocations made by each county pursuant to Section 96.1 or its predecessor section, *as modified by Section 97.2* or its predecessor section for the 1992–93 fiscal year, shall be modified for the 1993–94 fiscal year as follows . . . ." (§ 97.1, subd. (a), italics added; see § 97.3.) The County reads this language as explicitly "incorporat[ing]" ERAF I (then codified as § 97.2), including subdivision (b)(4). (Emphasis omitted.)

The City and County both offer plausible readings of the statutory language. We therefore turn to the legislative history of the ERAF statutes to see

if it provides additional illumination as to the Legislature's intent. (See *Kavanaugh v. West Sonoma County Union High School Dist., supra*, 29 Cal.4th at p. 919.)

 b. *The Legislative History of the ERAF Statutes*[26]

 (ii) *ERAF I*

As originally enacted, ERAF I did not include section 97.2, subdivision (b)(4), which expressly makes ERAF I applicable to qualifying cities entitled to TEA under section 98. However, as the County points out, it is clear from the legislative history the Legislature intended that qualifying cities share in the burden of this tax revenue shift.

For example, the Senate third reading summary explained: "The property tax allocation system established by AB 8 ensured that in any fiscal year, a local government received property tax revenues in an amount equal to what it received in the prior fiscal year (i.e., 'base') and its share of the growth in revenue resulting from growth in assessed value within its boundaries (i.e., 'increment'). [¶] AB 8 also authorized a permanent shift of a sizable portion of the property tax base from school districts to cities, counties, and special districts, provided state 'buyout' of certain county health and welfare program costs which had previously been financed with the local property tax, and involved a commitment of state revenues to replace much of the school property tax base lost. [¶] Although AB 8 eliminated the one-year state block grant payments to local governments, it did not eliminate the 'bailout' support. 'Bailout' was made a permanent feature of the state-local fiscal relationship by means of the permanent shift of the school property tax base to local agencies and state 'buyout' of certain health and welfare program costs. [¶] . . . [¶] This bill modifies the computations and allocations of property tax revenues to counties, cities, and special districts for the 1992–93 year, and redirects approximately $1.37 billion in property tax revenues pursuant to these modifications to school districts and community college districts. [¶] . . . [¶] Under this bill, a city would lose 13% of its property tax revenue in the prior year not to exceed $15.25 per capita. *No- and low-property tax cities and cities incorporated after 1978 are included in this provision* . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 617 (1991–1992 Reg. Sess.) as amended Aug. 22, 1992, pp. 7–8, italics added; accord, Assem. Com. on Judiciary, Conc. in Sen. Amends. to Assem. Bill No. 3213 (1991–1992 Reg. Sess.) as amended Aug. 28, 1992, pp. 7–8.)

---

[26] At the parties' request, the trial court took judicial notice of significant portions of the legislative history of the relevant statutes. We ordered the complete legislative history of these and other related statutes and, having complied with Evidence Code sections 455, subdivision (a), and 459, subdivisions (a) and (c), take judicial notice of additional portions of the legislative history.

Within a matter of months, the Legislature passed "clean-up" legislation to correct "technical errors, omissions, and ambiguities" in the previously passed "trailer bills (SB 617 and SB 844)." (Senate Rules Com., Off. of Senate Floor Analyses, 3d reading analysis of Assem. Bill No. 3027 (1991–1992 Reg. Sess.) as amended Aug. 10, 1992, pp. 1–2.) As the Enrolled Bill Report prepared by the Governor's Office stated: "These bills were drafted late in the legislative session and under very short time deadlines, and therefore, following enactment, numerous ambiguities in the language were discovered. [¶] AB 3027 would provide cleanup provisions for each of the above bills." (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 3027 (1991–1992 Reg. Sess.) as amended Oct. 8, 1992, pp. 5–6.)

With respect to qualifying cities entitled to TEA under section 98, the Senate Rules Committee report explained: "SB 844 meant to cut every city's property tax revenues by 9%; a permanent one-time adjustment. However, SB 844 ignored the interaction with the 'TEA' formula which shifts property tax revenues from counties to the formerly no- and low-property tax cities ([former] § 97.03[, subd. b]). Therefore, SB 844's cut will disappear in 1993–94 for many low-property-tax cities. [¶] This bill corrects this oversight and require[s] the county auditors to adjust the TEA formula." (Senate Rules Com., Off. of Senate Floor Analyses, 3d reading analysis of Assem. Bill No. 3027 (1991–1992 Reg. Sess.) as amended Aug. 10, 1992, p. 2.) The Enrolled Bill Report prepared by the Governor's Office similarly stated: "SB 617 and SB 844 were intended to reduce each city's property tax revenues by 9% for allocation to schools. However, the bills did not address the current TEA formula which is used to allocate property tax revenues to no and low property tax cities. As a result, this 9 % reduction is permanent for normal cities, but is only operative for one year for no and low tax cities. [¶] AB 3027 would clarify that the 9% revenue reduction for no and low tax cities shall also be permanent." (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 3027 (1991–1992 Reg. Sess.) as amended Oct. 8, 1992, pp. 1–2; see also Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 3027 (1991–1992 Reg. Sess.) as amended Oct. 8, 1992, p. 2 ["Corrects provisions to require no- and low-property tax cities to take a permanent, rather than one-time-only, cut in property tax revenues."].)

The County asserts section 97.2, subdivision (b)(4), merely "clarified" that ERAF I applies to qualifying cities entitled to TEA under section 98 and therefore made no substantive change to the statute. The County thus concludes ERAF I applies to qualifying cities even without the subdivision, presumably by virtue of the statute's prefatory "supremacy" language. Since ERAF I purportedly applies to qualifying cities without subdivision (b)(4), the County concludes ERAF's II and III also apply to qualifying cities without any such subdivision.

In our view, the legislative history shows the language of ERAF I as initially enacted—in a last-minute rush—omitted a provision necessary to effectuate the Legislature's intent that qualifying cities entitled to TEA under section 98 share the full burden of this tax revenue shift. While the Legislature clearly intended that ERAF I apply to TEA cities, the statutory language did not accomplish that result. Thus the need for the additional language provided by section 97.2, subdivision (b)(4)—to correct a "technical error, omission, or ambiguity" and thereby implement the Legislature's intent that qualifying cities entitled to TEA under section 98 be permanently subject to this tax revenue shift.

This legislative history also undercuts the County's arguments based on the statutory language. If the Legislature had understood the prefatory language of ERAF I to have the "supremacy" effect the County claims, that language, alone, would have made the statute applicable to qualifying cities, and there would have been no need for the Legislature to have added section 97.2, subdivision (b)(4). Similarly, if the Legislature had viewed the "section 97" statutes (establishing the ERAF's), "section 98" (implementing the alternative TEA system), and the "section 96" statutes (implementing the A.B. 8 allocation system) as a "statutory hierarchy" wherein the ERAF statutes "reign supreme," that hierarchal structure, alone, would have made ERAF I applicable to qualifying cities. The legislative history leaves no doubt, however, that as originally enacted—with the prefatory language and codified as a "section 97" statute, but without subdivision (b)(4)—the statute did *not* implement the Legislature's intent that ERAF I apply to qualifying cities entitled to TEA under section 98. We therefore fail to see how the County can conclude subdivision (b)(4) is essentially superfluous and the absence of such language in ERAF's II and III should be of no moment.

### (ii) *ERAF II*

The legislative history of ERAF II is also telling and shows the Legislature had a *different* intent with respect to qualifying cities entitled to TEA under section 98 in ERAF II than it had in ERAF I.

The final Senate Floor Analysis, for example, repeated verbatim the post-Proposition 13 historical overview set forth in the legislative history of ERAF I (quoted *ante*), recapped TEA under section 98 and summarized the particulars of ERAF II. (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993, pp. 3–5 [referencing the Assem. 3d reading analysis].) With respect to qualifying cities entitled to TEA under section 98, the analysis explained: "Additionally, cities which never levied a property tax rate or which levied low rates of property tax are known as 'no- and low-property tax cities.'

Existing law establishes a minimum property tax entitlement for no- and low-property tax cities located in counties which choose to participate in the Brown-Presley Trial Court Funding Act of 1988. This entitlement, known as the tax equity allocation (TEA), generally guarantees each city a seven-percent property tax increase phased-in over a seven-year period in equal installments beginning in the 1989–90 fiscal year. [¶] Any county which opts to receive state block grants for the support of its trial courts pursuant to the Brown-Presley Trail [sic] Court Funding Act is required to transfer a portion of its property tax revenues to the no- and low-property tax cities in the county." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993, p. 4.)

As to the particulars of ERAF II, the analysis stated: "This bill modifies the computations and allocations of property tax revenues to counties, cities, and special districts for the 1993–94 year and redirects approximately $2.530 billion in property tax revenues pursuant to these modifications to school districts, county offices of education, and community college districts." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993, p. 4.) As to cities, specifically, the analysis stated: "The property tax revenue reduction for cities is allocated to each city based pursuant to a formula based on its share of AB 8 'bailout,' with no city incurring a reduction which exceeds $19.31 per capita. *No-property tax cities and newly incorporated cities, which did not receive any AB 8 'bailout,' do not incur a property tax revenue reduction under this bill.*" (*Ibid.*, italics added; accord, Sen. Rules Com., Off. of Floor Analyses, 3d reading analysis of Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993, pp. 4–5.)

The enrolled bill report prepared by the Governor's Office of Planning and Research, which recommended the Governor sign the legislation, similarly provided background on post-Proposition 13 financing of local governments and discussed the additional shift of property tax revenues to the ERAF's. (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993, pp. 1–3.) This report explained: "In order to balance last year's State budget, SB 617 [ERAF I] was enacted to begin the 'undoing' of the SB 154 and AB 8 bailout created in 1978–79. SB 617 reshifted property tax revenues away from cities, counties, and special districts for allocation to school entities, thereby reducing the amount of State General Fund revenues needed to backfill school funding." (*Id.* at p. 2.) "SB 1135 would complete the repeal of the SB 154 and AB 8 bailout by shifting $2.595 billion in property tax revenues from local government to the ERAF as follows: [¶] Cities and Counties [¶] 1. $1.998 billion from counties. This reduction is allocated among counties using a formula which calculates each county's average of the amount of its total taxable sales and the amount of property tax revenue

reduction each county is proposed to receive under the Governor's May Revision of the 1993–94 Budget. [¶] 2. $288 million from cities. This reduction is allocated among cities using a formula based on each city's share of AB 8 bailout, with no city incurring a reduction which exceeds $19.31 per capita. *While no-property-tax cities participated in last year's property tax shift, they are exempt from the shift proposed in SB 1135." (Id.* at pp. 2–3, italics added.)

Thus, the legislative history shows the Legislature had a *different* intent with respect to qualifying cities entitled to TEA under section 98 in ERAF II, than it had in ERAF I. Whereas the Legislature intended that ERAF I apply to all qualifying cities, it did not intend that to be the case with respect to ERAF II. Notably, the final Senate floor analysis, the Senate third reading analysis, and the Assembly third reading report all stated "no-property tax cities" and "newly incorporated cities" were exempted from the ERAF II shift. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993, p. 4, referencing Assem. Com. on Floor Analyses, 3d reading analysis of Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993, p. 5.) "Newly incorporated cities," as we have discussed, refers to cities incorporated after Proposition 13 which received small tax bases—i.e., one of the two subsets of low-property-tax cities.

The legislative history therefore explains why ERAF II does not have a provision like section 97.2, subdivision (b)(4), which makes ERAF I applicable to *all* qualifying cities entitled to TEA under section 98. It likewise shows the Legislature's failure to include such an all-encompassing reference to the TEA statute was not a matter of oversight, but was a deliberate drafting decision, reflecting the Legislature's differing intent with respect to qualifying cities in ERAF II.[27]

█ Focusing on the enrolled bill report prepared by the Governor's Office of Planning and Research, the County contends the Legislature intended to spare only no-property-tax cities from the burden of ERAF II, and

---

[27] The County's reference to the legislative history of a 2006 amendment to the TEA statute pertaining solely to Santa Clara County (§ 98, subd. (m)) does not raise any ambiguity with respect to the legislative history of ERAF II. Nor does this later legislative history of the TEA statute support the County's holistic view that there is essentially "one" ERAF and therefore all three ERAF statutes must have the same reach with respect to qualifying cities entitled to TEA under section 98. On the contrary, the 2006 amendment of the TEA statute, altering the entitlement of Santa Clara County no- and low-property-tax cities, once again illustrates the political nature of the allocation battle and shows that when the Legislature intends to impact TEA, it says so.

not low-property-tax cities, like the City. We first observe this argument—which concedes that at least some qualifying cities under section 98 are *not* subject to ERAF II—is squarely at odds with the County's arguments based on the language of the statutes. As we have discussed, the County contends the prefatory language of the ERAF statutes is "supremacy" language, giving these statutes priority over the TEA statute and thus making all three ERAF statutes applicable to qualifying cities. It similarly contends the "section 97" statutes (establishing the ERAF's), "section 98" (implementing the alternative TEA system), and the "section 96" statutes (implementing the A.B. 8 allocation system) constitute a statutory hierarchy wherein the ERAF statutes "reign supreme" over the TEA statute. It also asserts additional prefatory language of ERAF II "incorporates" the substance of ERAF I, including section 97.2, subdivision (b)(4). These are all-or-nothing propositions—they do not admit of any "partial" supremacy. As the County is forced to acknowledge, however (at least as to no-property-tax cities), even though ERAF II contains the salient prefatory language and is codified as a "section 97" statute, the legislative history makes clear ERAF II does *not* have overarching preeminence with respect to the TEA statute. Thus, the Legislature plainly did not consider the prefatory language of the ERAF statutes or their placement in the code as having the preemptive effect the County urges. Likewise, the Legislature plainly did not view ERAF II as "incorporating" ERAF I and specifically section 97.2, subdivision (b)(4), making ERAF I applicable to all qualifying cities entitled to TEA under section 98.[28]

The County asserts the Legislature must have intended that only no-property-tax cities be excused from ERAF II because the statute was intended to end the state bailout of local governmental entities in the wake of Proposition 13 and one of the ERAF II shifts takes into account, in part, a city's receipt of bailout. Since no-property-tax cities received no bailout, the County reasons it makes sense ERAF II would not apply to them. However, this overlooks that ERAF I *began* the process of ending the bailout, which ERAF II completed. Yet, ERAF I expressly applies to *all* qualifying cities, including no-property-tax cities. Accordingly, whether or not a qualifying city received "bailout" is not ipso facto determinative of the applicability of the ERAF tax revenue shifts.

Additionally, while the enrolled bill report summarizing the legislation and urging the governor to sign it referenced only "no-property tax cities," the legislative analyses show the Legislature intended to exclude both no- and low-property-tax cities from the ERAF II revenue shift. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 1135 (1993–1994 Reg.

---

[28] This legislative history also dispenses with the County's argument that varying use of the terms "apportion," "allocation" and "payment" in the statutes compels the view the ERAF, TEA and A.B. 8 statutes constitute a tri-level statutory hierarchy.

Sess.) as amended June 23, 1993, p. 4, referencing Assem. Com. on Floor Analyses, 3d reading analysis of Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993; Sen. Rules Com., Off. Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1135 (1993–1994 Reg. Sess.) p. 5.) Moreover, the legislation was passed on the Senate floor and sent to the Governor on the same day, leaving no doubt the Legislature's intent was as declared in the relevant legislative analyses. (Sen. Com. on Budget & Fiscal Review, Final History on Sen. Bill No. 1135 (1993–1994 Reg. Sess.) as amended June 23, 1993.)

■ While we disagree with the County that only no-property-tax cities are excluded from ERAF II, we nevertheless conclude the legislative history shows the statute does apply to *some* qualifying cities. The legislative history makes clear ERAF II does *not* apply to no-property-tax cities and does *not* apply to cities incorporated *after* Proposition 13 which received small tax bases and therefore are low-property-tax cities (i.e., "newly incorporated cities"). However, it makes no mention of cities incorporated *before* Proposition 13 which had adopted low tax rates and therefore are also low-property-tax cities. (See discussion, *ante*, at pp. 9–12 & fns. 4 & 7.) Had the Legislature intended that *pre*-Proposition 13 low-property-tax cities be exempt from this tax revenue shift, it could easily have referred to them in the legislative history, as it clearly and repeatedly did with respect to "no-property tax cities" and "newly incorporated cities" (i.e., post-Prop. 13 low-property-tax cities).

Further, as the County points out, the statutory formula implementing the sum-certain ERAF II shift takes into account a city's receipt of the post-Proposition 13 bailout provided by Assem. Bill 8. (§ 97.3, subd. (b)(2)(A)–(E).) No-property-tax cities and cities incorporated after Proposition 13 did not receive any of this bailout, but low-property-tax cities incorporated before Proposition 13 did. Thus, the ERAF II statutory formula comports with an intent to exclude some, and perhaps even most, qualifying cities entitled to TEA under section 98 (specifically, no-property-tax cities *and* cities incorporated *after* Proposition 13 which received small tax bases), but not all such cities (specifically, cities incorporated *before* Proposition 13, which had adopted a low-property-tax rate).

■ " '[O]ur task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose . . . .' " (*Chosak v. Alameda County Medical Center* (2007) 153 Cal.App.4th 549, 559 [63 Cal.Rptr.3d 184], quoting *Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291 [48 Cal.Rptr.3d 183, 141 P.3d 288].) "Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails

over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) "Ultimately, '[t]he legislative purpose will not be sacrificed to a literal construction of any part of the statute.' " (*Chosak v. Alameda County Medical Center, supra,* 153 Cal.App.4th at p. 559, quoting *Giles v. Horn* (2002) 100 Cal.App.4th 206, 220 [123 Cal.Rptr.2d 735].)

■ Here, the operation of the statutory formula accords with the legislative history and effectively defines the reach of ERAF II with respect to qualifying cities entitled to TEA under section 98. That reach is *limited* to *pre*-Proposition 13 low-property-tax cities. The statute does not apply to no-property-tax cities or to low-property-tax cities incorporated after Proposition 13 (i.e., "newly incorporated cities"). Since the City was incorporated before Proposition 13, and thus, is a *pre*-Proposition 13 low-property-tax city, we conclude it is subject to ERAF II.

(iii) *ERAF III*

ERAF III, enacted 10 years after ERAF II, was part of a complicated redistribution of vehicle licensing fee revenues. The 2004 Summary Digest of the legislation (Sen. Bill No. 1096 (2003–2004 Reg. Sess.)) explained: "This bill would repeal, amend, revise, and recast various provisions relating to VLF revenue allocations, VLF offsets, and General Fund transfers to cities, counties, and cities and counties to compensate these entities for reduced revenues resulting from these offsets. This bill would require, for the 2004–05 fiscal year and each fiscal year thereafter, that each city, county, and city and county annually receive a vehicle license fee adjustment amount, as defined, from a Vehicle License Fee Property Tax Compensation Fund, which this bill would create in each county. [¶] . . . Existing property tax law requires the county auditor, for each fiscal year, to allocate property tax revenue to local jurisdictions in accordance with specified formulas and procedures, and generally requires that each jurisdiction be allocated an amount equal to the total of the amount of revenue allocated to that jurisdiction in the prior fiscal year, subject to certain modifications, and that jurisdiction's portion of the annual tax increment, as defined. Existing property tax law also reduces the amounts of ad valorem property tax revenue that would otherwise be annually allocated to the county, cities, and special districts pursuant to these general allocation requirements by requiring, for purposes of determining property tax revenue allocations in each county for the 1992–93 and 1993–94 fiscal years, that the amounts of property tax revenue deemed allocated in the prior fiscal year to the county, cities, and special districts be reduced in accordance with certain formulas. It requires that the revenues not allocated to the county, cities, and special districts as a result of these reductions be transferred to the Educational Revenue Augmentation Fund (ERAF) in that

county for allocation to school districts, community college districts, and the county office of education. . . . [¶] This bill would, for the 2004–05 and 2005–06 fiscal years, reduce, by a specified amount, the vehicle license fee adjustment amount required to be allocated to a city, county, and city and county and instead require these revenues to be deposited in a county ERAF." (Legis. Counsel's Dig., Sen. Bill No. 1096 (2003–2004 Reg. Sess.) 6 Stats. 2004, Summary Dig., p. 82.)

■ This legislative history shows that, unlike ERAF's I and II, ERAF III was part of a complex scheme to redistribute VLF. And, unlike the legislative history of ERAF's I and II, the legislative history of ERAF III makes no mention *at all* of qualifying cities entitled to TEA under section 98. We therefore conclude the absence of *any* reference to qualifying cities in the legislative history of ERAF III is consistent with the lack of *any* such reference in the statutory language and indicative of intent that ERAF III is not applicable to any qualifying cities entitled to TEA under section 98.

This conclusion is buttressed by the language of the companion "VLF swap" statute, section 97.70, enacted with ERAF III and which expressly addresses TEA. Subdivision (f) of section 97.70 states the VLF distribution it mandates shall not be construed to "[a]lter the manner in which ad valorem property tax revenue growth from fiscal year to fiscal year is otherwise determined or allocated" or "[r]educe ad valorem property tax revenue allocations required under Article 4 (commencing with Section 98)." (§ 97.70, subd. (f)(3)–(4).) Absent these provisions, ERAF revenues diverted to a qualifying city to make up for lost VLF revenues could be considered property tax revenues allocated to the city, impacting its eligibility for allocation under the TEA statute. Thus, not only was the Legislature fully cognizant of the TEA statute when it was crafting the legislative package effectuating the redistribution of VLF revenue, of which ERAF III was a part, it took explicit steps to ensure that qualifying cities were not negatively impacted by this revenue shuffle.

### c. *Interpretative Materials*

The County contends its comparative A.B. 8 allocation analysis—which treats all three ERAF statutes as applicable to all qualifying cities entitled to TEA under section 98—is consistent with long-standing, administrative interpretation of the relevant statutes and therefore should be given significance deference. The County cites to the "California Property Tax Managers' Reference Manual" prepared by a committee appointed by the California Auditor-Controllers' Association (Reference Manual), the "1993–94 Property Tax Shift Uniform Guidelines for California Counties" prepared by the County Accounting Standards and Procedures Committee of the California

Auditor-Controller's Association (Uniform Guidelines), and a "Report to the California State Legislature: Property Tax Apportionments, Calendar Year 2007" prepared by the State Controller (Controller's Report).

We first consider the Reference Manual and the Uniform Guidelines. Neither undertakes an analysis of the statutory language, and neither makes any mention of the legislative history. Rather, both publications are practice focused and discuss recommended methodologies for making allocation determinations. Both also treat all qualifying cities the same under the ERAF statutes.[29]

Neither the Reference Manual, nor the Uniform Guidelines, has been adopted by any state agency as regulations. Indeed, it is the SCO's position that it is bound only by the relevant statutes and while it "considers . . . the accounting procedures set forth in the manual and/or guidelines," it "is not bound by them." Accordingly, these publications by a professional organization, albeit an organization largely of local officials, as well as the State Controller, do not carry the interpretive weight that adheres to formal regulations adopted by an agency charged with implementing a statutory scheme. (*Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86, 92 [130 Cal.Rptr. 321, 550 P.2d 593]; *Mackey v. Bristol West Ins. Service of Cal., Inc.* (2003) 105 Cal.App.4th 1247, 1262–1263 [130 Cal.Rptr.2d 536] [agency interpretation in informational booklet entitled to less weight than formal regulation].) Even in the absence of regulatory force, long-standing interpretation of a statutory scheme by an administrative agency charged with implementing it bears some consideration. (See *American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 750–751 [102 Cal.Rptr.3d 759] [some weight given to agency practice followed for 12 years as stated in policy memorandum and letters written by United States Department of Agriculture officials].) Here, while the Reference Manual and Uniform Guidelines are publications of a professional organization, not a governmental agency, they do reflect the long-standing practice of governmental officials.

---

[29] For example, the Reference Manual states: "In addition to this process [for determining the TEA], ERAF legislation in 1992–93 and 1993–94 required that we shift property taxes from all jurisdictions to the schools. General practice, and one that has passed State Audit, has been that we calculate AB 8, then TEA allocations, and then make the shifts to ERAF. As a result, qualifying cities participate in the shift and actually receive less than the calculated TEA amount." The Uniform Guidelines similarly provide: "For those counties having a TEA formula calculation pursuant to Revenue and Taxation Code Sections 97.35 [now codified as section 98], 97.36, and 97.38, the 1992–93 ERAF shift amounts plus growth shall be included with each city's 1992–93 allocation for the purpose of computing the 1993–94 TEA formula. For all subsequent years, a similar ERAF adjustment shall be made to the city's allocation before computing the TEA formula. [¶] The above tax allocation adjustment is necessary prior to the TEA formula calculation in order to remove the impact of the ERAF shifts. Otherwise, counties would be reimbursing the [qualifying cities] for their ERAF shift amounts."

The Controller's Report, in turn, reported on audits of five counties, which included reviewing whether the "computation and apportionment of property tax revenues to low-and no-tax cities was in accordance with Revenue and Taxation Code section 98 . . . ." One of the counties audited was Los Angeles, which uses the same methodology for making the A.B. 8 and TEA allocation comparison as Santa Cruz County. The Controller's Report concluded overall "[t]he property tax allocation and apportionment system is generally operating as intended." As to TEA, in particular, the report stated: "Revenue and Taxation Code section 98 and the Guidelines for County Property Tax Administration Charges and No/Low Property Tax Cities Adjustment, provided by the County Accounting Standards and Procedures Committee, provide a formula for increasing the amount of property tax allocated to a city that had either no or low property tax revenues. [¶] We noted no findings for this area." The report did not discuss or provide an analysis of the "formula" provided by the Auditor-Controllers' Association. Nor is there any indication whether the audits, including of Los Angeles County, focused on both the TEA formula set forth in section 98, about which there is no dispute in this case, or the method for determining the comparative A.B. 8 allocation figure, which is disputed.[30]

▪ While administrative interpretation of a statutory scheme is entitled to due regard, it is not determinative and cannot override the plain language of the statutes and the import of the legislative history. (See *American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1994) 23 Cal.App.4th 51, 58 [28 Cal.Rptr.2d 210] [although court will give great weight to agency's view of a statute or regulation, a reviewing court construes the statute as a matter of law and will reject administrative interpretations where contrary to statutory intent]; see also, e.g., *Los Angeles Unified School Dist., supra,* 181 Cal.App.4th 414 [holding county's allocation methodology improperly reduced school district's share of redevelopment passthrough payments].) The "final responsibility" for interpreting a statute or regulation rests with the courts. (*Lazarin v. Superior Court* (2010) 188 Cal.App.4th 1560, 1569–1570 [116 Cal.Rptr.3d 596]; *Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 28 [285 Cal.Rptr. 515].)

▪ As we have discussed, the statutory language reflects and the legislative history shows that qualifying cities entitled to TEA under section 98 are *not* to be treated the same under the three ERAF statutes. Rather, the Legislature intended that ERAF I apply to all qualifying cities, and it said so. It did not, however, intend that ERAF II apply to all such cities; rather, ERAF II

---

[30] Nor do the selected portions of the Los Angeles County audit report in the record provide any detail about the audit, including whether it examined both the TEA formula calculations as required by section 98 and the method for determining the comparative A.B. 8 allocation figure.

applies only to pre-Proposition 13 low-property-tax cities and does not apply to no-tax cities or to low-property-tax cities incorporated after Proposition 13 (i.e., "newly incorporated cities"). Finally, neither the language nor legislative history of ERAF III reflects any intent that it affect the tax equity afforded to any qualifying city under section 98. We thus conclude the publications prepared by the California Auditor-Controller's Association and the State Auditor's report (which simply cites to the materials prepared by the association) are largely at odds with the language and intent of ERAF's II and III and entitled to no deference as to the ERAF issues before us.

### 3. *The Impact of Redevelopment*

As we have discussed, the County also includes in its comparative A.B. 8 allocation figure a portion of the property tax increment allocated to the SVRA. Specifically, the County deems the City to have received the tax increment it would have received had the SVRA not been created. Although the SVRA is a local governmental entity separate and distinct from the City, and the City does not in fact receive the tax revenues allocated to the SVRA, the County contends this augmentation of the comparative A.B. 8 allocation figure is necessary to "neutralize" the effect of redevelopment on property tax allocation.

The County characterizes the creation of a redevelopment agency as an "elective option" available to a city, and the exercise of such option as "a policy and expenditure decision made in the legislative discretion" of a municipality's governing body. (Emphasis omitted.) Such a decision, according to the County, "divert[s] . . . property tax revenues that would have been paid to" the City. (As the County points out, at the time the SVRA was formed, cities could not enter into "passthrough" agreements to recoup for themselves any of the redevelopment tax increment.)[31] The County thus characterizes the redevelopment increment it includes in its A.B. 8 comparative allocation figure as the City's "General Fund Redevelopment Contribution" to the redevelopment agency.

The City maintains the Legislature has already addressed the issue of redevelopment by amending the TEA formula set forth in section 98 specifically to account for it. It further contends there is no legal basis for the

---

[31] The redevelopment statutes in effect at the time the SVRA was formed allowed some passthrough agreements, but prohibited them with creating entities. (See Health & Saf. Code, former § 33401, subd. (b), repealed by Stats. 1993, ch. 942, § 23, p. 5358.) Since 1994, the law applicable to redevelopment projects has lacked this component and, instead, provides a formula that spells out how redevelopment tax increment is to be passed through to taxing entities within a redevelopment area. (Health & Saf. Code, § 33607.5, subd. (a).)

County's assertion that a city, and specifically a city precluded by prior law from entering into a passthrough agreement with a community redevelopment agency, owes an annual "redevelopment contribution" to such an agency which must be added into a comparative A.B. 8 allocation figure.

■ When the TEA statute was enacted in 1987, it made no mention of redevelopment and, specifically, said nothing about the tax increment attributable to property within the bounds of a community redevelopment agency. (Stats. 1987, ch. 1211, § 47.7, p. 4329.) The following year, when the statute was amended to reduce the TEA guarantee from 10 to 7 percent, the Legislature also modified the TEA formula to take account of redevelopment. (§ 98, subd. (c)(1)–(6) [enacted as § 97.35 (Stats. 1988, ch. 944, § 6, p. 2980)].) The TEA formula is now a six-step process, five steps of which address redevelopment. (§ 98, subd. (c)(1)–(6).) This formula basically requires that the tax base of a qualifying city—the number to which the 7 percent is applied to determine how much TEA the city receives—be reduced by the amount of any tax increment allocated to, and kept by, a redevelopment agency. (§ 98, subd. (c)(1)–(5).) Reducing a qualifying city's tax base effectively reduces its TEA, but not to the extent that results from the County's additional augmentation of the comparative A.B. 8 allocation figure at issue here.

The legislative history explains that the impetus for this change to the TEA formula was the counties' concern that they were losing an unfair amount of property tax revenues to qualifying cities and community redevelopment agencies. The Joint Conference Committee Report, for example, stated: "Existing Law [¶] A number of questions have arisen about the interpretation of the property tax allocation provisions of SB 709 [(the initial TEA legislation)] and redevelopment tax increment. Is the allocation to nos and lows to be 10 percent of the total inclusive or exclusive of any tax increment allocated to a community redevelopment agency (CRA)? [¶] Proposal [¶] Counties argue that the allocation should be determined on the basis of property tax revenues exclusive of the increment allocated to the CRA since they already are 'losing' their share of the tax increment to the CRA. If it is included in the total upon which the no- and low-allocation is determined they will lose it twice! Some cities had argued that it should be inclusive of any CRA increment, since the increment received by a CRA cannot be used by the city's general fund. [¶] In negotiations on SB 2735 (McCorquodale), the League of Cities and Anthony Gonsalves agreed to the county position on this issue, so it probably should be considered a technical issue at this point." (Joint Conf. Com. Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) & Sen. Bill No. 612 (1987–1988 Reg. Sess.) pp. 25–26.)

The Assembly Conference Committee Report similarly stated the legislation "[a]djusts the [TEA] shift to account for redevelopment." (Assem. Com.

on Judiciary, Analysis of Assem. Bill No. 1197 (1987–1988 Reg. Sess.) as amended Aug. 31, 1988, p. 1.) The report explained: "Last year's bill did not recognize the effects of redevelopment agencies' property tax increment financing. Assembly bill 1197 requires county auditors to adjust the property tax shifts to neutralize redevelopment agencies' fiscal effects, following three main steps. First, the auditor determines the total amount of property taxes generated within the city. Then the auditor subtracts the amount of property tax increment which goes to the redevelopment agency (minus any pass-through payments, both cash and in-kind, which the redevelopment agency gives to other local agencies). The resulting difference becomes the amount against which the auditor calculates the city's property tax shift. For example, if total property tax revenues in a no- or low-property tax city is $25 million and its redevelopment agency received $5 million of that amount as tax increment revenues, then county officials must calculate the city's property tax shift based on the $20 million amount, not the $25 million." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1197 (1987–1988 Reg. Sess.) as amended Aug. 31, 1988, p. 3.)

Thus, in amending the TEA statute, the Legislature specifically considered the counties' concerns about the tax increment attributable to redevelopment property. It chose to address those concerns by expanding the TEA formula to expressly take into account the tax increment allocated to a redevelopment agency. (§ 98, subd. (c)(1)–(6).)

The County basically asserts the Legislature did not go far enough. Pointing to the purpose of the amended TEA formula—to "neutralize" the effect of redevelopment—the County contends that to fully achieve that goal, it not only must take the steps set out in the TEA formula, but must also adjust the comparative A.B. 8 allocation figure to include the tax increment the City would receive had it not created the SVRA.

We initially observe the legislative history does not reflect an intent to wholly neutralize the effect of redevelopment. Rather, the Legislature was concerned with eliminating a "double" blow to counties, indicating the counties could still be impacted to some degree. Furthermore, in the face of language specifically added to the TEA statute to address redevelopment tax increment, we must conclude this is the Legislature's chosen means to address this issue. (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1197 (1987–1988 Reg. Sess.) as amended Aug. 31, 1988, p. 3 ["Assembly bill 1197 requires county auditors to adjust the property tax shifts to neutralize redevelopment agencies' fiscal effects, *following three main steps*" set forth in the expanded § 98 formula], italics added; see also *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000 [90 Cal.Rptr.2d 236, 987 P.2d 705].) The Legislature could have added additional language to the TEA

statute, the A.B. 8 statutes or the redevelopment statutes, requiring an additional adjustment to the comparative A.B. 8 allocation figure to further account for redevelopment. But the Legislature did not make any such changes. Thus, even if the expanded TEA formula does not wholly neutralize the effect of redevelopment, it is not our role to rectify any such shortcoming in these complex real property tax allocation statutes. Rather, the counties must return to the Legislature to seek further modification of the relevant statutes.[32] (See *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 594 [79 Cal.Rptr.3d 489] (*County of San Diego*); *City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 790 [27 Cal.Rptr.2d 545] (*City of Sacramento*).)

We discern no legal basis for the County's "redevelopment contribution" theory. As we have discussed, this construct by the County is predicated on the facts the City "voluntarily" created the SVRA and at that time, the City could not enter into a passthrough agreement with the agency. Thus, according to the County, the City made a deliberate, legislative determination to "divert" to the SVRA property tax revenues the City otherwise would have received. However, no statute, redevelopment or otherwise, speaks of a "redevelopment contribution" by any city or county creating a redevelopment agency, let alone a city precluded from entering into a passthrough agreement. While we understand the import of the phraseology used by the County (and by other county auditor-controllers), it is an expression of its view that the TEA formula, even as amended, does not adequately account for redevelopment. Any further adjustments in that regard, however, are a matter for the Legislature, not the courts.[33] (See *County of San Diego, supra,* 164 Cal.App.4th at p. 594; *City of Sacramento, supra,* 22 Cal.App.4th at p. 790.)

---

[32] While the County cites to legislative history that purportedly supports its augmentation of the comparative A.B. 8 allocation figure, in fact, it is history of the TEA statute as originally enacted and notes the problem that was *rectified* the following year by the amendment of the TEA formula. (Compare Sen. Com. on Appropriations, Fiscal Summary Rep. of Sen. Bill No. 407 (1987–1988 Reg. Sess.) as amended June 8, 1987, p. 1 with Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1197 (1987–1988 Reg. Sess.) as amended Aug. 31, 1988, p. 3.)

[33] The County also contends the TEA formula, alone, results in a "windfall" to qualifying cities that have created redevelopment agencies. It asserts such cities effectively receive 100 percent of the redevelopment increment which is otherwise passed through to various taxing agencies, plus "reimbursement" of the city's "redevelopment contribution." It warns this will create a "profit" motive for qualifying cities to create redevelopment agencies. We fail to see how the 7 percent TEA guarantee, which backs out redevelopment increment, effectively passes on to a qualifying city 100 percent of the redevelopment tax increment. Nor, as we have explained, is there any merit to the County's assertion that cities bear an annual "redevelopment contribution." In any case, the County's windfall argument is another variation of its argument that the Legislature did not do enough to account for redevelopment when it amended section 98 to augment the TEA formula—an argument it must make to the Legislature, not the courts.

Coming at its "redevelopment contribution" argument from another angle, the County also contends what must be compared is "apportionment" under the A.B. 8 statutes (assertedly a "gross up" concept which embraces redevelopment increment), and "allocation" under the TEA statute. In support of this assertion, the County points out section 96.1 (the principal A.B. 8 statute) begins, in part: "Except as otherwise provided in Article 3 (commencing with Section 97), and in Article 4 (commencing with Section 98) . . . property tax revenues shall be *apportioned* to each jurisdiction pursuant to this section . . . , *subject to allocation* and payment of funds as provided for in subdivision (b) of Section 33670 of the Health and Safety Code . . . , to each jurisdiction in the following manner . . . ." (§ 96.1, subd. (a), italics added.) As best as we can understand the County's argument, it views the first phrase of the above quoted language as establishing an "original" A.B. 8 number and posits this is the number that must be compared with the allocation figure derived under the TEA formula. This "original" A.B. 8 number, as the County sees it, omits the subsequently referenced Health and Safety Code section 33670, subdivision (b), allocation. Health and Safety Code section 33670 provides the allocation directive and linkage to community redevelopment agencies. (See § 96.1, subd. (a); Health & Saf. Code, § 33670.) Accordingly, this "original" A.B. 8 number is a "gross" number in the sense that it subsumes what section 96.1 otherwise requires be allocated to a community redevelopment agency under Health and Safety Code section 33670.

The County, in other words, urges a view of section 96.1—solely in the context of reaching a comparative A.B. 8 allocation for TEA purposes— that heeds only the first phrase of the first sentence of the statute, and disregards the remaining language. The County cites no authority for such a construction, and we are aware of none. Indeed, the first phrase of the first sentence of section 96.1 also makes specific reference to both the ERAF statutes and the TEA statute, and does so with equal dignity and with deference. Moreover, the remainder of the statutory language provides that the required "apportionment" shall occur by making specified "allocations." (§ 96.1, subd. (a)(1)–(2).) Adopting the County's inventive "original" A.B. 8 comparison figure argument would also create a seeming anomaly—a TEA formula that expressly accounts for redevelopment, but a comparative Assem. Bill 8 analysis that does not (and, in fact, reads out of § 96.1 the language that expressly does address redevelopment). Nothing in the statutory language or the legislative history supports such a result.

Finally, the language of the TEA statute guarantees the amount of tax revenues to be "distributed" to a city. (§ 98, subd. (k).) The legislative history similarly speaks in terms of comparing the tax revenues a qualifying city would *receive*—not revenues that are only theoretically "apportioned" to a city based on a myopic partial reading of one sentence of section 96.1 that disregards the remainder of the statute. (See Off. of Local Government

Affairs, Enrolled Bill Rep. on Assem. Bill No. 1197 (1987–1988 Reg. Sess.) Sept. 9, 1988, p. 2 [receipt of TEA will "only occur if it is no less than what the qualifying cities would have received without the TEA formula"]; cf. Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 617 (1991–1992 Reg. Sess.) as amended Aug. 22, 1992, pp. 7–8 [referring to Assem. Bill 8 as establishing an "allocation" system].)

We therefore conclude that, unless the Legislature has otherwise clearly provided, it intends that no- and low-property tax cities *actually receive* 7 percent of local property tax revenues as guaranteed by section 98.

## IV. DISPOSITION

We conclude the trial court correctly interpreted the property tax statutes in question, except sections 97.1 and 97.3 (ERAF II). We therefore grant writ relief, in part, and order the trial court to (a) vacate its order as to ERAF II and (b) recalculate the amounts the City is entitled to recoup from the County commencing with the 2003–2004 tax year and direct the County to calculate future TEA, in accordance with this opinion. The parties are to bear their own costs in connection with this writ proceeding.

Marchiano, P. J., and Dondero, J., concurred.

A petition for a rehearing was denied November 23, 2011, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied January 4, 2012, S198373.